Christopher J. Sullivan (CJS 3761)
HERRICK, FEINSTEIN LLP
2 Park Avenue
New York, New York  10016
(212) 592-1400

Attorneys for Plaintiffs JFURTI, LLC
   and Jacob Frydman


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X

| | |
|---|---|
| JFURTI, LLC and JACOB FRYDMAN, Suing Individually and Derivatively and On Behalf of All Similarly Situated and Limited Partners Shareholders in the Name and Right of FIRST CAPITAL REAL ESTATE TRUST INCORPORATED and FIRST CAPITAL REAL ESTATE OPERATING PARTNERSHIP, L.P., : : : : : : : : : | Civil Action No. |
| Plaintiffs : : : | **COMPLAINT** |
| -against- : : | Jury Trial Demanded |
| FORUM PARTNERS INVESTMENT MANAGEMENT, LLC; RUSSELL C. PLATT; MARBLE 15 SCS; PRESIDENTIAL REALTY CORPORATION; SUNEET SINGAL; JAVIER VANDE STEEG; MICHAEL MCCOOK; FIRST CAPITAL REAL ESTATE ADVISORS, LP; FIRST CAPITAL REAL ESTATE INVESTMENTS, LLC; FIRST CAPITAL BORROWER, LLC; and UNITED 25250 TILDEN, LLC, : : : : : : : : : : | |
| Defendants : : | |
| - and - : : | |
| FIRST CAPITAL REAL ESTATE TRUST INCORPORATED and FIRST CAPITAL REAL ESTATE OPERATING PARTNERSHIP, L.P., : : : : : | |
| Nominal Derivative Defendants. : | |

------------------------------------------------------------- X

Plaintiffs JFURTI, LLC ("**JFURTI**") and Jacob Frydman ("**Frydman**," and together with JFURTI, "**Plaintiffs**"), suing individually and derivatively in the name and right of First Capital Real Estate Trust Incorporated ("**First Capital REIT**") and First Capital Real Estate Operating Partnership, L.P. ("**First Capital OP**" or "**the Operating Partnership**"), by their attorneys, Herrick, Feinstein LLP, for their Complaint against Defendants Forum Partners Investment Management LLC ("**Forum**"), Russell C. Platt ("**Platt**"), Marble 15 SCS ("**Marble**," and together with Forum and Platt the "**Forum Defendants**"), Presidential Realty Corporation ("**Presidential REIT**"), Suneet Singal ("**Singal**"), Javier Vande Steeg ("**Vande Steeg**"); Michael McCook ("**McCook**"); First Capital Real Estate Advisors, LP ("**First Capital Advisor**"), First Capital Real Estate Investments, LLC ("**FCREI**"), First Capital Borrower, LLC ("**First Capital Borrower**"), United 25250 Tilden, LLC ("**Tilden**" and together with Singal, Steeg, McCook, First Capital Advisor, FCREI and First Capital Borrower, the "**FC Defendants**") (the Forum Defendants, the FC Defendants and Presidential REIT collectively referred to herein as "**Defendants**," and each as a "**Defendant**"), and First Capital REIT and First Capital OP, as Nominal Derivative Defendants, allege as follows, upon knowledge with respect to themselves, their own acts, and the specified acts of misconduct and misrepresentations by Defendants, and upon information and belief as to all other matters.

### Nature of Action

1.     This is an action under the Racketeer Influenced and Corrupt Organizations Act ("**RICO**"), 18 U.S.C. § 1961 et seq. (1964), the Securities Exchange Act of 1934 ("**Exchange Act**"), 15 U.S.C. § 78a et seq. (1934), and state law, for treble, actual and punitive damages, injunctive relief, an accounting and attorneys' fees.

2.       From September 15, 2015 to the present time, Defendant Singal and the FC Defendants -- first acting alone and then in concert with the Forum Defendants and Presidential -- have engaged in a fraudulent scheme (as summarized in ¶¶ 1-21 herein, the "**Fraudulent Scheme**") to take control of First Capital REIT, and to then use the REIT to divert monies to their own purposes.  (First Capital REIT is a publicly registered fully reporting 1933 and 1934 Act public company that is organized as a real estate investment trust.)

3.       Until September 15, 2015, Plaintiff JFURTI was the majority owner (directly, as well as agent for minority owners) of the ownership interests in Defendant First Capital Advisor, a privately held company which, with its principal, Plaintiff Frydman, founded, sponsored and took public First Capital REIT, and the other affiliated companies that control and operate First Capital REIT (together with First Capital Advisor, the "**First Capital Entities**").

4.       On September 15, 2015, JFURTI sold 100% of the ownership interests in First Capital Advisor and the other First Capital Entities to Defendant Singal and his affiliated entities (the "**FC Private Entities**") in a transaction (the "**REIT Acquisition**") that was financed in part with a purchase money secured loan from Plaintiff JFURTI.  By virtue of the transaction, Singal and the FC Private Entities (through First Capital Advisor) became the sole control person of First Capital REIT.  As part of the REIT Acquisition, Singal and the FC Private Entities transferred and contributed securities, deeds and contract rights to First Capital OP, the operating partnership of First Capital REIT, which assumed the debt associated with those assets.  Singal then used Operating Partnership limited partnership units to pay for and collateralize the REIT Acquisition.

5.       Plaintiff Frydman continues to be a shareholder of First Capital REIT, holding 47,680 shares of stock in First Capital REIT.  Together, Plaintiffs JFURTI and Frydman

own (directly and by collateral assignment) in excess of 25% of all of the issued and outstanding shares of common stock of First Capital REIT, and Plaintiff JFURTI is one of the largest creditors of the FC Defendants.

6.      As demonstrated herein, beginning on September 15, 2015 and continuing to the present time, Defendants have systematically and continuously conducted a corrupt enterprise through a pattern of racketeering in violation of RICO, all of which acts are continuing in nature, and for the wrongful purpose of intentionally defrauding Plaintiffs.   Each of Defendants knowingly and intentionally agreed and conspired to commit the predicate acts of racketeering and securities violations underlying the Fraudulent Scheme.

7.      In particular, Defendant Singal, who has a material conflict of interest by virtue of being at the same time a personal obligor to Plaintiff JFURTI, the chief executive officer and chairman of First Capital REIT and the First Capital Entities, the control person of the FC Private Entities, and directly or indirectly the majority owner of First Capital Borrower and the First Capital Guarantors, has, in concert with the Forum Defendants and the FC Defendants, formed an association in fact to frustrate and hinder Plaintiffs' enforcement of the Note and Guarantees.   Through the use of knowingly false and misleading mail and wire communications, these Defendants have engaged in the Fraudulent Scheme, transferred and diverted to themselves and various third-party entities monies and other assets that should have been used to pay Plaintiffs, and concealed and misrepresented their actions from the shareholders of First Capital REIT and the limited partners of the Operating Partnership.

8.      To that end, Defendant Singal misrepresented to First Capital REIT, the shareholders of the REIT, the Operating Partnership and the limited partners of the Operating

Partnership, the value of the assets that he and the FC Private Entities contributed to the REIT and its operating partnership, First Capital OP, as part of the REIT Acquisition.

9.     Singal then conspired and colluded with the Forum Defendants (his affiliated partners and private lenders), including, in particular, their principal, Defendant Platt, to prevent and frustrate Plaintiff JFURTI from enforcing and collecting a $16,259,556.67 purchase money obligation that is owed to it in connection with the REIT Acquisition. In that connection, the FC Defendants misrepresented to Plaintiffs the net asset value and other terms of 1,465,827.58 shares of stock of First Capital REIT that are pledged as collateral for the purchase money obligation, and misrepresented to and concealed from Plaintiffs and the public factual information about the financial condition, obligations and operations of First Capital REIT that drastically impacts the value of the pledged stock and JFURTI's decision to accept the stock as collateral for the obligation.[*]

10.     After they concluded the REIT Acquisition, the FC Defendants set out to divert to the Forum Defendants and to certain newly formed companies the fees and commissions presently paid by First Capital REIT to the obligors on the purchase money obligation, and to fraudulently transfer all of the assets of First Capital REIT and its subsidiaries to Presidential REIT, an insolvent shell company whose stock is currently trading for 3 cents per share. In order to conceal the Fraudulent Scheme, Singal and the other FC Defendants failed and

---

[*] Following multiple defaults by the FC Defendants, the purchase money loan was restructured pursuant to a written Settlement Agreement dated as of June 1, 2016 between Plaintiffs and Singal, various FC Defendants and First Capital REIT (the "**Settlement Agreement**"). Pursuant to the Settlement Agreement, Defendants Singal and First Capital Borrower executed a $16,259,556.67 Promissory Note (the "**Note**") to Plaintiff JFURTI. Payment of the Note is guaranteed in writing (the "**Guarantees**") by Defendants First Capital Advisor and FCREI (and ten affiliated and subsidiary entities of First Capital REIT (collectively, the "**First Capital Guarantors**")). The Note is collateralized by a pledge of 1,465,827.58 units of the Operating Partnership, which now have been converted into 1,465,827.58 shares of stock of First Capital REIT. The Note and Guarantees are in default and in litigation in the New York County Supreme Court. Each of the First Capital Guarantors provides services to, and depends for its existence and revenues on, a substantial income stream of fees and commissions from First Capital REIT.

refused to prepare or file the audited financial statements, quarterly financial reports and supplemental prospectuses for First Capital REIT that are required by the federal securities laws.

11.     Thus, for example, between September 15, 2015 and February 28, 2016, First Capital REIT raised approximately $17 million through a public offering of common stock. Upon information and belief, all or part of the $17 million raise was paid to First Capital REIT but has been converted, dissipated and/or wasted by the FC Defendants.  Officers and/or employees in the offices of First Capital REIT have informed Plaintiffs in this matter that First Capital REIT is no longer in possession of such funds and that the location and/or use of such funds has not been disclosed or accounted for to the shareholders of First Capital REIT.

12.     Notwithstanding numerous written demands to the FC Defendants and First Capital REIT's board of directors for an accounting with respect to said $17 million in proceeds of stock sales, no accounting has been provided to Plaintiffs.  To the contrary, Defendants, and in particular Singal, Vande Steeg and McCook have affirmatively sought to deny and conceal from Plaintiffs information about the missing funds and the Fraudulent Scheme.

13.     During the same period of time and continuing to date, the FC Defendants have taken, or have failed to take, the following actions on behalf of First Capital REIT since acquiring control of First Capital REIT and the affiliated First Capital Entities:

(a)     failed to file any required quarterly financial statements or reports for more than a full calendar year;

(b)     failed to file any required annual audited financial statements for First Capital REIT in violation of its reporting requirements under the federal securities laws;

(c)　　failed to file any supplemental prospectuses which were required to be filed under the federal securities laws, and especially during periods when First Capital REIT's stock was being sold to the public;

(d)　　recently represented to the public in a series of mail and wire communications that the net asset value ("**NAV**") per share of First Capital REIT stock has grown from $12.49 to $16.03 per share without providing adequate public disclosure to support this increased valuation;

(e)　　caused First Capital REIT to default on six mortgage loans or preferred equity financings in its portfolio which had been personally guaranteed by Plaintiff Frydman when those transactions were originally consummated prior to the sale to Defendant Singal and his various affiliated companies, and which guaranties were expressly assumed as part of the September 15, 2015 sale transaction to Defendant Singal and his various FC Private affiliated companies;

(f)　　lost title to one of the aforementioned mortgaged properties for nonpayment of real property taxes, leaving the debt obligation personally guaranteed by Frydman (and assumed by Singal and his affiliates) intact, albeit in default, still due and owing, but with the collateral gone;

(g)　　failed to make contractual indemnification payments to JFURTI in excess of $1.3 million pursuant to the Settlement Agreement, which was the subject of Plaintiffs' first indemnification demand on the FC Defendants dated June 16, 2016;

(h)　　failed to make contractual indemnification payments to JFURTI totaling in excess of $3.9 million, pursuant to the Settlement Agreement which were the subject to Plaintiffs' second indemnification demand on the FC Defendants dated September 29, 2016;

7

(i)      materially misrepresented in mail and wire communications the true state of facts relating to certain hotel properties in Houston, Texas that the FC Defendants contributed to First Capital REIT as part of the September 15, 2015 sale transaction;

(j)      borrowed $15 million from the Forum Defendants in exchange for a secret commitment to transfer the assets of First Capital REIT, free and clear of liability to Plaintiffs, to a new entity controlled by Singal and the Forum Defendants.

(k)      borrowed an additional $2.5 million from the Forum Defendants, which they caused to be repaid with First Capital REIT's funds, notwithstanding that First Capital REIT had no obligation on that debt, effectively wasting and misappropriating the assets of the Public REIT for the Forum Defendants' benefit at the unjustifiable expense of First Capital REIT, and by extension, its shareholders, including Plaintiffs;

(l)      notwithstanding that the $2.5 million loan was the obligation of one or more of Singal's FC Private Entities, caused one of First Capital REIT's subsidiaries, Defendant United 2520 Tilden Fee, LLC, ("**Tilden**") to pay the repayment amount of approximately $3.5 million notwithstanding that Tilden had no obligation on that debt, effectively wasting and misappropriating the assets of Tilden for the Forum Defendants' benefit at the unjustifiable expense of Tilden, First Capital REIT, and by extension, its shareholders, including Plaintiffs; and

(m)      refused and/or failed to recognize the proper net asset valuation of 1,465,827.58 shares of stock of First Capital REIT that were pledged and collaterally assigned to Plaintiff JFURTI.

14.      On April 20, 2016, the United States Securities and Exchange Commission ("**SEC**") announced that its Division of Enforcement was conducting an

investigation of First Capital REIT, and issued a subpoena to First Capital REIT for documents relating to, among other things, the calculation of the NAV per share of First Capital REIT stock.

15.     On July 18, 2016, First Capital REIT, through Defendant Singal, announced in a public disclosure under Rule 8K of the Securities and Exchange Act of 1934 that it had entered into a Letter of Intent with Defendant Presidential REIT to sell "substantially all of its assets, and those of its subsidiaries," to Presidential REIT, for Class B shares of limited voting stock of Presidential REIT, by September 18, 2016.

16.     The transaction is a sham and without adequate consideration.

17.     A review of Presidential REIT's most recent 10-Q filing with the U.S. SEC evidences that it has a negative net worth, is unable to pay its employees' salaries (which are being deferred until the sale closes, or some other capital event occurs), and is incapable of coming up with any kind of cash with which to purchase First Capital REIT's approximately $300 million in assets which, at a published NAV of $16.03, represent a net equity value of more than $100 million.

18.     In a public press conference on July 26, 2016, Singal further disclosed that First Capital REIT had closed a transaction with Defendant Forum, its "institutional sponsor partner," and brought on their senior management team to work with him and the rest of the First Capital senior management team in advising and operating Defendant First Capital Advisor, which, as the external advisor to First Capital REIT, controls First Capital REIT.  Singal further disclosed that upon the transfer of First Capital REIT's assets to Presidential REIT, he would be working with the Forum Defendants' senior management team to manage and operate the combined entity under the Presidential REIT brand going forward.

19.     In other words, the FC Defendants and the Forum Defendants, directly and/or through affiliates, have already formed, or are in the process of forming, new entities to act as the external advisor to Presidential REIT after they gain control of Presidential REIT's board and after Presidential REIT "acquires" all of First Capital REIT's assets through a share exchange.  To accomplish the sale, each share of First Capital REIT common stock (currently valued at $16.03 per share) will be exchanged for one share of Presidential REIT Class B stock (currently trading at $00.03 per share, with a net loss per share in 2015 of -$00.12 per share).

20.     The effect of the sale will be to strip the First Capital Guarantors of all of their assets, revenues, and income streams.  This will leave them incapable of paying the defaulted $16,259,556.67 principal obligation under the Note and the Guarantees as well as the additional approximately $5 million in indemnification payments which are due to Plaintiff JFURTI under the Settlement Agreement.  Unable to terminate the written agreements between First Capital REIT and the First Capital Guarantors without payment of substantial termination fees, Defendants are simply ignoring them by stripping First Capital REIT of its assets and thereby diverting the income stream generated by those assets which otherwise would be paid to the First Capital Guarantors, to newly-formed entities which the Defendants control.  Thus, just as he announced at his press conference, Defendant Singal is conspiring with the Forum Defendants to control Defendant Presidential REIT and the fees and revenues generated by the assets it is acquiring from First Capital REIT and its subsidiaries.

21.     Plaintiffs now sue individually and derivatively (a) to recover treble, actual and punitive damages and attorneys' fees for First Capital REIT, First Capital OP, and themselves, respectively, arising from the Fraudulent Scheme; (b) to recover damages for the interference by the Forum Defendants and Presidential REIT with the monetary obligations in

written agreements with Plaintiffs and/or between First Capital REIT, First Capital Borrower and the Guarantors; (c) to recover damages for the FC Defendants' fraud with respect to the stock of First Capital REIT that is pledged and collaterally assigned to JFURTI; (d) to obtain judgment requiring the Forum Defendants to disgorge the ill-gotten approximately $3.5 million from First Capital REIT; (e) to obtain judgment declaring the proper net asset value of the 1,465,827.58 shares of common stock of First Capital REIT that are pledged to JFURTI; and (f) to enjoin as a fraudulent conveyance the sale or disposition of substantially all of the assets of First Capital REIT and those of its subsidiaries to Defendant Presidential REIT.

## Jurisdiction and Venue

22.     This Court has subject matter jurisdiction over this action:

(a)     pursuant to 28 U.S.C. § 1331 because claims herein arise under the laws of the United States;

(b)     pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961(c) et seq. (1964), because claims herein seek recovery for violations of 18 U.S.C. § 1962;

(c)     pursuant to the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. (1934), because claims herein seek recovery for violation of Section 10-b and Rule 10b-5; and

(d)     pursuant to 28 U.S.C. § 1367(a), because state law claims asserted herein are so related to the claims arising under the laws of the United States that they form part of the same case or controversy.

23.     This Court has personal jurisdiction over Defendants (a) which maintain offices and do business in New York and whose written agreements with Plaintiffs provide for

11

jurisdiction in the State and Federal courts of New York, and (b) pursuant to New York CPLR 301 and 302(a)(1) for doing business and transacting business within the State, (c) pursuant to CPLR 302(a)(3)(ii) for commission of tortious acts without the State causing injury to person or property within the state, and (d) because they are co-conspirators in a racketeering scheme that involved fraudulent transferring funds and other assets in New York and that directly affects Plaintiffs in New York.

24.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(d) because Defendants all maintain offices in this district.  Venue is also proper pursuant to 28 U.S.C. § 1391(a)(3) because all of Defendants are subject to personal jurisdiction in this district and there is no district in which the action may otherwise be brought.  In addition, Plaintiffs and the FC Defendants have expressly agreed in various loan agreements between them that the New York state and federal courts are the proper forum for any litigation between them pertaining to the matters in this Verified Complaint, and that New York law governs such matters.

### The Parties

25.     Plaintiff JFURTI is a Delaware limited liability company with a principal place of business at 46 Ledgerock Lane, Hyde Park, New York.

26.     Plaintiff Frydman is a resident of the State of New York, and the manager of JFURTI.

27.     Upon information and belief, Defendant Forum is a Delaware limited liability company, with an office at 60 Broad Street, 34th Floor, New York, New York.

28.     Upon information and belief, Defendant Platt is a United States citizen, residing in London, UK, with a residence in the state of Connecticut and an office at 60 Broad

Street, 34th Floor, New York, New York.  Upon information and belief, Defendant Platt serves as the Chief Executive Officer and Managing Director of Defendant Forum.

29.     Upon information and belief, Defendant Marble is a partnership organized under the laws of the Grand Duchy of Luxembourg, and an affiliated company of Defendant Forum, with an office in New York at 60 Broad Street, 34th Floor, New York, New York.

30.     Upon information and belief, Defendant Steeg is an independent director of First Capital REIT, residing in California, with an office in New York at 60 Broad Street, 34th Floor, New York, New York.

31.     Upon information and belief, Defendant McCook is an independent director of First Capital REIT, residing in California with an office at 60 Broad Street, 34th Floor, New York, New York.

32.     Upon information and belief, Defendant Presidential REIT is a Real Estate Investment Trust organized in 1983 with a principal place of business at 1430 Broadway, Suite 503, New York, New York.  According to its public disclosures, Defendant Presidential REIT is engaged principally in the ownership of income-producing real estate, and currently owns one property in Massachusetts.  Presidential REIT has authorized two classes of shares, Class A shares and Class B shares.  Both Class A and B Presidential REIT shares have similar economic rights, but the Class A shares, which as a group represent just 16% of the total issued and outstanding Presidential REIT shares, have the right to elect 75% of the board of directors, while the Class B Shares, which as a group represent 84% of the total issued and outstanding Presidential REIT shares, only have the right to elect 25% of the board of directors.  The company's Class A and Class B common stock trade in the over-the-counter market under the symbols PDNLA and PDNLB, respectively.

13

33.     Upon information and belief, Defendant Singal is a resident of the State of New York.  Upon information and belief, Singal is directly or indirectly the majority owner, and the Chief Executive Officer and Chairman, of all of the FC Private Entities and all of the First Capital Entities.  Upon information and belief, Singal also serves as the Chief Executive Officer of First Capital REIT.

34.     Upon information and belief, Defendant First Capital Advisor (formerly known as United Realty Advisors, LP) is a Delaware limited partnership with a principal place of business at 60 Broad Street, New York, New York.  Pursuant to a written advisory agreement (the "**Advisory Agreement**") with Defendant First Capital REIT that cannot be terminated without payment of a substantial fee, First Capital Advisor conducts the operations and manages (directly, or through its management company affiliates) the property portfolio of First Capital REIT and all of its assets.  First Capital Advisor is the exclusive external advisor to First Capital REIT, and thereby solely controls and manages First Capital REIT and all of its properties and assets.

35.     Upon information and belief, Defendant FCREI is a Delaware limited liability company with a principal place of business at 60 Broad Street, New York, New York, and is the private holding company through which Defendant Singal indirectly owns and/or controls Defendant First Capital Advisor and its affiliates.

36.     Upon information and belief, Defendant Singal is the CEO and controlling party of Defendant FCREI, which, in turn, controls Defendant First Capital Advisor.  Singal is also the CEO of First Capital REIT, with fiduciary obligations to First Capital REIT arising out of this position.  Since June 2016, on information and belief, the Forum Defendants, and in

particular Defendant Platt, have controlled Defendant FCREI through a pledge and collateral assignment of its assets and those of Singal and First Capital Advisor.

37.     Upon information and belief, Defendant First Capital Borrower is a Delaware limited liability company with a principal place of business at 60 Broad Street, New York, New York.

38.     Upon information and belief, Defendant Tilden is a Delaware limited liability company with a principal place of business at 60 Broad Street, New York, New York. Tilden owns certain real property in Brooklyn, New York which generates monthly income for First Capital REIT.

39.     Upon information and belief, Derivative Defendant First Capital REIT (formerly known as United Realty Trust Incorporated) is a publicly registered Real Estate Investment Trust organized in Maryland with a principal place of business at 60 Broad Street, New York, New York.  First Capital REIT owns 100%, or close to 100%, of First Capital OP, and exercises total control over the operations of First Capital OP.  No claim is asserted against First Capital REIT, which is a nominal defendant.

40.     Upon information and belief, derivative Defendant First Capital OP is a Delaware limited partnership with a principal place at 60 Broad Street, New York, New York, and owns and controls special purpose entity Tilden and additional special purpose entities holding title to real property and other assets of value.  No claim is asserted against First Capital OP, which is a nominal defendant.

41.     Unlike Presidential REIT, which has "internalized" management, First Capital REIT is an "externally" managed REIT.  Internally managed REIT, such as Presidential REIT, are owned by their public shareholders and are managed by an internal management team,

which is employed by First Capital REIT directly.  Externally managed REIT, such as First

Capital REIT, are also owned by their public shareholders but unlike internally managed REITs,

have no paid employees and no internal management team, and instead are exclusively managed

pursuant to an Advisory Agreement (in First Capital REIT's case, with First Capital Advisor).

Thus, First Capital Advisor (not First Capital REIT itself) employs all of First Capital REIT's

management team, and makes all decisions for First Capital REIT, is in control of all of First

Capital REIT's properties and assets, is solely authorized to act on behalf of First Capital REIT,

and is compensated by payment of a laundry list of fees (see footnote 1 herein) from which it

pays its employees and handsomely compensates its equity owners.

## Allegations Common to All Causes of Action

### The REIT Acquisition

42.     On or about September 15, 2015, Plaintiffs sold to Defendant FCREI and

various of Singal's other affiliated entities 100% of the ownership interest in Defendant First

Capital Advisor and various affiliated entities (the "**Purchased Interests**").  As consideration for

Plaintiffs' sale of the Purchased Interests, Singal and various of the affiliated First Capital

Entities agreed and contracted to make a series of monetary payments to Plaintiffs.

43.     Singal and the other First Capital Entities then defaulted on three

consecutive occasions on their obligations to make the payments under the September 15, 2015

agreement.  After each such default, Singal and the other First Capital Entities requested and

Plaintiffs agreed to restructure the terms and conditions of the payment obligations.

### The Settlement Agreement

44.     After the third such default, Plaintiffs entered into the Settlement

Agreement.  In the Settlement Agreement, the FC Parties thereto jointly and severally agreed to

pay to JFURTI by wire transfer of immediately available funds the sum of $10 Million, referred to in the Settlement Agreement as the "Mandatory Payment."  Singal and the other FC Defendants used telephone calls and emails to negotiate the Settlement Agreement, and made the Mandatory Payment by wire transfer of funds.

45.     The funds for the Mandatory Payment originated in whole or in part from the Forum Defendants.  Specifically, on June 9, 2016, FCREI entered into a strategic agreement with Forum, pursuant to which Forum agreed to provide strategic advice to FCREI, including with respect to product development, capital raising and operational efficiency. Forum also agreed to provide strategic advice to First Capital Advisor, the Property Manager, and the Operating Partnership.  In connection with the entry into the strategic agreement, FCREI entered into a loan agreement with an affiliate of Forum for $15 Million, the proceeds of which were used to partially finance the purchase of the remaining interests in First Capital Advisor, the Property Manager and the Operating Partnership held by Frydman, as part of the larger Settlement Agreement. Forum received 170,590.36 limited partnership units in the Operating Partnership and the option to receive a 20% interest in First Capital Advisor and the Property Manage as a result of the transaction.

46.     Also in that Settlement Agreement, the parties agreed that (a) the Purchased Interests would be transferred to a newly formed entity called First Capital Borrower, LLC, which would execute and deliver to Plaintiffs the $16,259,556.67 Note, and (b) Singal (as a primary co-obligor on the Note) and the twelve First Capital Guarantors (including First Capital Advisor and FCREI) would guarantee the primary and direct payment of the sums evidenced by the Note.

47.     The parties further agreed that the Note would be secured by a pledge and collateral assignment of 1,465,827.58 units of limited partnership interest in the Operating Partnership, which conducts all of the business of First Capital REIT, subject to an election on the part of JFURTI to convert the limited partnership units into an equal number of pledged shares of stock of First Capital REIT.   JFURTI exercised its right to convert the pledged collateral into common stock of First Capital REIT on August 16, 2016, with an effective date of September 16, 2016.

48.     Pursuant to Section 8 of the Settlement Agreement, the FC Defendants promised to JFURTI the right to demand the conversion of Collateral (i.e. OP Units) to common shares of First Capital REIT on a "one-for-one basis."   The Pledge Agreement at Section 2.7 entitled "Collateral Release & Conversion," reiterated this "one-for-one basis" promise.   At the time of conversion, First Capital REIT's common stock had a published NAV pursuant to EDGAR filings of $16.03.   Notwithstanding this fact, the FC Defendants caused the demanded conversion to occur not on the as promised and misrepresented one-for-one basis but on the faulty attribution of a share price of less than $12.49, representing a difference of over $5 million.

49.     Section 8 of the Settlement Agreement incorporates by reference Section 7.10 of an earlier master agreement, dated September 15, 2015 (the "**Master Agreement**"). Under the incorporated provisions, the FC Defendants and their affiliates (collectively, "**Buyer**" under the Master Agreement) -- now including on information and belief the Forum Defendants -- are prohibited from interfering with or obstructing Plaintiffs' right to collection of payment or distribution on account of the pledged collateral for the purchase money loan.   They are further prohibited from inducing or permitting First Capital REIT to terminate (or otherwise reduce or

18

discontinue) its relationship with First Capital Advisor, or circumventing the Advisory Agreement by permitting First Capital REIT to transfer all or substantially all of its assets, or otherwise reducing or discontinuing the business relationship between First Capital Advisor and First Capital REIT, as follows:

SECTION 7.10

Certain Prohibitions,

(a) As a material inducement to the Parties entering into this Agreement; (i) Seller agrees that for a period of twenty four (24) months after the Closing; and (ii) **the Buyer agrees that** after the execution hereof and for a period of twenty four (24) months after the Closing; or termination of this Agreement should this Agreement be terminated in accordance with its terms, **it shall not, and shall not permit any of its principals or affiliates to directly or indirectly**:

a. solicit or induce or influence any person which has a business relationship with the Companies, and/or any of their respective assets, to discontinue or reduce the extent of such relationship in a manner in any way detrimental to the Companies; ...

50.     Moreover, Section 7.10 (b) of the Master Agreement, which was also incorporated by reference into Section 8 of the Settlement Agreement, contractually prohibits the FC Defendants, and their affiliates -- including, without limitation, the Forum Defendants and Presidential REIT -- from directly or indirectly taking any action which in any way is intended to, or does, strip First Capital Advisor of its revenue stream.  That revenue stream is a contractual right for the benefit of Plaintiffs JFURTI and Frydman (the "**Sellers**" under the Master Agreement) and comprises the sole revenue source from which the purchase money Note can be repaid, as follows:

(b) Buyer expressly agrees that after the execution hereof, Buyer shall not take any action, or fail to take any action which does, or is in any way intended to, limit, diminish, hinder, impact negatively, circumvent, or otherwise directly or indirectly curtail, or attempt to curtail, and will not

permit the Companies or any of their employees from acting or failing to act in any fashion which, may or does, or is intended to, limit, diminish, hinder, impact negatively, circumventor otherwise directly or indirectly curtail or attempt to curtail, any of the rights reserved by and for the benefit of Seller, its Principals and Affiliates as set forth in this Agreement.

51.     The Settlement Agreement also obligated the First Capital Borrower and Guarantors to indemnify any and all payments made by Plaintiffs, or any of their affiliates, in connection with a certain judgment referred to in the Settlement Agreement as the "**Canada Judgment**," within thirty (30) days of written demand for same, time being of the essence.

52.     Notwithstanding the express provisions of the Settlement Agreement, Defendants conspired and plotted together to undermine and interfere with the monetary obligations in the Settlement Agreement and the written agreements between First Capital REIT and the First Capital Guarantors.

### The Wrongful Transfer of the Houston Hotels

53.     In connection with the transactions which closed on September 15, 2015, and as reported by the FC Defendants in an amended 8-K filing with the SEC on September 25, 2015, $53,831,138.00 of the total $175 million in contributed assets which were required to be contributed by the FC Defendants to First Capital REIT in exchange for approximately $42 million of OP Units in First Capital REIT's Operating Partnership (of which $9,599,797 represented the "equity" value of those contributed assets) was represented by certain hotel properties located in Houston, Texas (the "**Houston Hotels**").

54.     Pursuant to the transaction documents, the FC Defendants represented and warranted to Plaintiffs and to First Capital REIT and the operating partnership, ***as a material inducement to enter into those agreements***, at Section 6.1 of the Master Agreement and Articles

III and V of the related Asset Purchase Agreement, that the Houston Hotels and all of the other

assets contributed by the FC Defendants as follows:

> (i) the [FC Defendants are] the owner of the UP REIT Assets, or has the right to acquire 100% of the ownership interests in each of the UPREIT Assets and will convey to the REIT at Closing, good and marketable title to the UPREIT Assets owned by Buyer free from all claims, liens and encumbrance except only the Permitted Exceptions; (ii) there are no proceedings at law or in  equity before any court, grand jury, administrative agency or other  investigative agency, bureau or instrumentality of any kind pending or, to the best of Buyer's knowledge, threatened, against or affecting the UPREIT Assets that (i) involve, or in any way may affect, the validity or enforceability of this Agreement or any other instrument or document to be delivered by Buyer pursuant hereto; … (iii) the execution and delivery of, and Buyer's performance under this Agreement, the UPRIET Agreement and any documents delivered by Buyer pursuant to this Agreement or the UPRIET Agreement are within Buyer's powers and have been duly authorized by all requisite actions, and Buyer obtained, or at Closing shall have obtained, all approvals required to be obtained by Buyer to consummate all of the transactions contemplated in this Agreement and the UPREIT Agreement, and this Agreement and the UPREIT Agreement are the legal, valid and binding obligation of [the FC Defendants] enforceable in accordance with their terms.

> 55.     Notwithstanding the FC Defendants' express representations and

warranties to the contrary, as disclosed just ten days later in an amended 8-K filing with the SEC

on September 25, 2015, the FC Defendants disclosed:

> Due to a maturity default with respect to approximately $42 million of mortgage debt secured by the Houston Hotels (the "Houston Hotels Debt"), their former owners had placed the Houston Hotels into a voluntary Chapter 11 reorganization proceeding under the federal bankruptcy laws (the "Proceeding"). It is the intention of the Company to cause the Houston Hotels Debt to be refinanced as soon as practicable, and, by virtue thereof, repay the Houston Hotels Debt and seek dismissal of the Proceeding or the confirmation of a plan of reorganization. There can be no assurance that the Company will timely refinance the Houston Hotels Debt, or that if such refinancing is obtained, that the Proceeding will be dismissed or that a plan of reorganization will be confirmed. There can be no assurance that any such refinancing can be obtained on favorable terms, or at all. In the event that the Houston Hotels Debt cannot

timely be refinanced, or for other reasons, the risk exists that the Houston Hotels could be foreclosed on, which would result in a loss to the Company and the financial condition of the Company could be materially and adversely affected. As of September 15, 2015, $44,231,341 of Houston Hotel Debt was outstanding, which is related to Contributed Assets representing $9,599,797 of net equity value.

56.     The above quoted disclosure revealed, and in fact constituted admissions by the FC Defendants, that the representations and warranties made in the Master Agreement and the Asset Contribution Agreement (also referred to as the Up REIT Assets under the Master Agreement) -- all of which were a "material inducement" to Plaintiffs entering into those transactions -- were indeed false and fraudulent.

57.     In truth, the FC Defendants not only materially misrepresented the state of facts with respect to the Houston Hotels to the Plaintiffs, but shortly after the filing of the September 25, 2015 amended 8-K, on information and belief, the Houston Hotels were simply transferred out of the First Capital REIT, with no consideration whatsoever, to other affiliates of the FC Defendants, resulting in the loss of at least $9,599,797.00 by the First Capital REIT.

58.     The transfer of approximately $53,831,138.00 of the total $175 million in assets which were required to be contributed by the FC Defendants to First Capital REIT in exchange for approximately $42 million of OP Units, without any consideration, constitutes waste and misappropriation, and is a breach of the FC Defendants' fiduciary duties owed to Plaintiffs and the other shareholders of First Capital REIT.

**The Dissipation and Waste of**
**$17 Million in Cash Assets of First Capital REIT**

59.     Between the September 15, 2015 sale of assets from Frydman and JFURTI to the FC Defendants, and the execution of the aforementioned Settlement Agreement, the FC

22

Defendants, upon information and belief, took additional steps to further strip the assets of First Capital REIT.

60.      From at least September 15, 2015 through February 28, 2016, First Capital REIT through an offering of Common Stock, raised approximately $17 Million.

61.      Officers and/or employees in the offices of First Capital REIT have informed Plaintiffs in this matter that First Capital REIT is no longer in possession of such funds and that the location and/or use of such funds has not been disclosed.

62.      Upon information and belief, all or part of the $17 Million raise has been converted, dissipated and/or wasted by the FC Defendants in connection with the Fraudulent Schemes.

### The Forum Defendants $15 Million Loan to Singal

63.      On June 9, 2016, Singal caused FCREI to enter into a Strategic Agreement with Forum pursuant to which Forum would purportedly provide strategic advice to Defendants FCREI and First Capital Advisor and to FCREI Property Management, LLC (the "**Property Manager**"), the FCRE's property manager.   In connection with the entry into the Strategic Agreement, the FCREI entered into a loan agreement with an affiliate of Defendant Forum to obtain a $15 Million loan, the proceeds of which were used to partially finance the purchase from Plaintiff under the Settlement Agreement of the remaining interests in First Capital Advisor, FCREI and First Capital OP.

64.      Upon information and belief, this $15 Million loan was secretly made for the benefit of Singal and the FC Defendants in exchange for a secret commitment to transfer the assets of First Capital REIT, free and clear of liability to Plaintiffs, to a new entity controlled by Singal and the Forum Defendants.

**The Fraudulent Conveyance of $3.5 Million
In Cash Assets of First Capital REIT**

65.     As stated, in connection with the entry into the Strategic Agreement, FCREI entered into a loan agreement with an affiliate of Forum for $15 Million, the proceeds of which were used to partially finance the purchase of the remaining interests in First Capital Advisor, the Property Manager and the Operating Partnership held by Frydman, as part of the larger Settlement Agreement.

66.     Although the Forum Defendants have, on information and belief, structured their transactions with the relevant First Capital Entities ostensibly as "loan" transactions, the Forum Defendants most certainly are not acting as lenders to any of the First Capital Entities.  To the contrary, on information and belief, the Forum Defendants have taken control of the FC Defendants and their affiliates by embedding their own senior management personnel in the highest echelons of management of the FC Defendants, including in particular Malcolm Gllyn (CFO), Nimit Oberoi (CFA; VP First Capital Deal Runner), and Aaron Goldberg (lead outside counsel) and requiring that the FC Defendants seek approval from the Forum Defendants for virtually all material decisions, irrespective of whether such decisions relate to the Forum "loans" or not.  By virtue thereof, the Forum Defendants have taken control of the FC Defendants, First Capital Borrower, and all guarantors under the Guarantees.  The Forum Defendants are making principal decisions on behalf of those entities, not for the benefit of any First Capital entity or First Capital REIT shareholders, but rather to the detriment of those shareholders and for the benefit of the Forum Defendants.

67.     The Forum Defendants, who on information belief have not made any loans or advances to First Capital REIT or any of its subsidiaries, and have no privity with First

24

Capital REIT or any its subsidiaries, have also usurped control over First Capital REIT and its subsidiaries by taking over decision-making authority and requiring their approval with respect to decision-making at First Capital REIT.  By virtue of such wrongful control, the Forum Defendants were able to cajole the FC Defendants into causing First Capital REIT to pay Forum funds which were not owed by it to Forum.

68.     Defendants had an obligation to disclose that management decisions which Plaintiffs and the public had been led to believe were independently being made for the benefit of the shareholders by Defendants Singal, Steeg and McCook as the board of directors of First Capital REIT -- have instead been usurped by, or yielded to, the Forum Defendants, who instead are motivated to, and on information and belief, are in fact, acting in the Forum Defendants' self-interests to the detriment of Plaintiffs and the other shareholders of the First Capital REIT.  No such disclosures have been made.

69.     Upon information and belief, at or around the same time as the foregoing July disclosures, the second $2.5 Million Non-REIT loan was provided from Forum and/or one of its affiliates, to one or more of the FC Private Entities, which are owned and/or controlled by Defendant Singal.  Upon information and belief, the Non-REIT Loan is not an obligation of either the public company, First Capital REIT, or any of its subsidiaries.

70.     Upon information and belief, the Non-REIT Loan required repayment within 60 days, but was instead paid approximately 30 days late, which resulted in interest and fees so substantial as to bring the repayment amount after 90 days to almost $3.5 Million.   This equates to an interest yield of more than one hundred sixty percent (160%) per annum - an outrageous sum by any standard - made even more outrageous as it was paid by an entity, which on information and belief - had no obligation to make said payment!

25

71.     Specifically, Tilden is a special purpose entity that holds significant real property assets.  Tilden is owned through a holding company by the Operating Partnership, which is in turn owned by the First Capital REIT.  First Capital REIT holds and controls all of its real property assets through the foregoing structure (i.e., through one or more holding companies and single-purpose entities ultimately holding the fee interests).

72.     On September 16, 2016, $3,464,500.00 was wired pursuant to a federal wire with IMAD Fed reference #: 20160915G1B7011C000151 directly from Tilden's bank account to Forum's bank account, an account that the Forum Defendants maintain at Wells Fargo Bank.  On November 4, 2016, $67,645.11 was wired pursuant to a Federal wire with IMAD Fed reference #: 161104090553H200 directly from Tilden's bank account to an unidentified account at Deutsche Bank.

73.     Upon information and belief, First Capital REIT a public company with obligations to its shareholders, owed no obligations to Forum under the $2.5 Million loan (either in its own name, or through the Operating Partnership or any special purpose entity), and, upon information and belief, none of the foregoing entities are in privity with any of the Forum Defendants under any loan agreements.

74.     The aforementioned $3.5 Million payment by  Tilden constituted waste and misappropriation of assets from First Capital REIT, which had no obligation to make such a payment to Forum or any of its affiliates.

75.     The Forum Defendants knew or should have known that Tilden was not an obligor of any sums due to the Forum Defendants or any of their affiliates.  Instead, the Forum Defendants accepted repayment of the Non-REIT Loan from Tilden, and thereby colluded with and participated with the FC Defendants in a joint and ongoing scheme to pillage as much of

26

First Capital REIT's assets as possible, to the benefit of the FC Defendants and the Forum Defendants, and to the extreme detriment of Plaintiffs and the other First Capital REIT shareholders.

76.     The Forum Defendants colluded and participated with the FC Defendants in misappropriating almost $3.5 million of First Capital REIT's cash.  The Forum Defendants knowingly repaid themselves sums not due from First Capital REIT or any of its subsidiaries from those entities, helping themselves to the assets of those entities, simply *because that's where the money was.*  These actions constitute waste and breach of fiduciary duty as to all Defendants with respect to First Capital REIT.

77.     The Forum Defendants, in collusion with the First Capital Defendants, have, on information and belief, conspired to strip the First Capital REIT of its assets through an arrangement by which the Forum Defendants "loan" funds to the FC Private Entities, but are granted collateral security interests in the assets of First Capital REIT, so that when the FC Private Entities fail to pay, Defendants will simple "take" the First Capital REIT's assets -- which were wrongfully used as collateral in the first place - in satisfaction of the debt owed, not by First Capital REIT - but First  Capital Private, all to the detriment of Plaintiffs and similarly situated shareholders of First Capital REIT.  These actions constitute waste and breach of fiduciary duty as to all Defendants with respect to First Capital REIT.

### The Sale of First Capital REIT's
### Assets to Defendant Presidential REIT (the "Sale")

78.     All of the First Capital Guarantors depend on income or payments from First Capital REIT and any other offerings for their existence.

79.     Pursuant to the Advisory Agreement with First Capital REIT, First Capital Advisor, one of the First Capital Guarantors, is contractually entitled to and receives on an annual basis millions of dollars in fees and promoted interests from First Capital REIT, which fees are paid monthly.[†]   The Advisory Agreement cannot be canceled without incurring substantial termination fees.   Pursuant to a certain property management agreement (the "**Management Agreement**") with First Capital REIT, non-party First Capital Property Management, LLC, one of the First Capital Guarantors, is contractually entitled to and receives on an annual basis up to 4.5% of the gross rental revenues generated by First Capital REIT's

---

[†] Pursuant to the First Capital REIT prospectus, First Capital Advisor is entitled to the following 11 categories of fees:

1.   *Acquisition Fees* -  1% of the contract purchase price of each property acquired;

2.   *Organization and Offering Expenses* -  reimburse up to 2% of the total offering price paid by investors;

3.   *Acquisition Expenses* - reimburse for expenses actually incurred related to selecting, evaluating and acquiring assets on behalf of the First Capital REIT, regardless of whether we actually acquire the related assets;

4.   *Construction and Development Management Fee* - to provide construction and development management services for some of our properties;

5.   *Asset Management Fees* - a monthly fee equal to the greater of (a) the amount as calculated in the preceding sentence, and (b) one-twelfth (1/12) of 1% of the average of our daily NAV for the preceding month, payable on the first business day of each month.

6.   *Property Management Fees* - equal to 4.5% of the monthly gross receipts from the properties managed by our property manager;

7.   *Leasing Fees* - in an amount that is equal to 2% of the sum of all rent payments that a tenant will be contractually obligated to make under a renewal lease and 5% of the sum of all rent payments that a tenant will be contractually obligated to make under a new lease;

8.   *Oversight Fee* - For services in overseeing property management and leasing services provided by any person or entity that is not the First Capital REIT's property manager or an affiliate - an oversight fee equal to 1% of the gross revenues of the property managed.

9.   *Operating Expenses* - reimburse our advisor's costs of providing administrative services, subject to the limitation for any amount by which total operating expenses at the end of the four preceding fiscal quarters exceeds the greater of (i) 2% of average invested assets and (ii) 25% of net income other than any additions to reserves for depreciation, bad debt or other similar non-cash reserves and excluding any gain from the sale of assets for that period.

10.   *Financing Coordination Fee* - If First Capital Advisor provides services in connection with the origination or refinancing of any debt that we obtain and use, directly or indirectly, to finance properties or other investments, or that we assume, directly or indirectly, in connection with the acquisition of properties or other investments, a financing coordination fee equal to 1% of the amount available or outstanding under such financing or such assumed debt.

11.   *Supplemental Transaction-Based Advisory Fees* - If the independent directors approve, from time to time, to provide certain services, which might include brokerage services, services in connection with the origination or refinancing of debt, or advice in connection with joint venture opportunities and equity financing opportunities for our properties.

$300 million real estate portfolio, in annual property management and oversight fees from First Capital REIT, which fees are paid monthly.

80.     In addition to the foregoing substantial fees it currently receives from First Capital REIT, First Capital Advisor is also entitled to 15% of all distributable net income in excess of a 7% return to First Capital REIT shareholders, 15% of all distributable sums in excess of the shareholders' invested capital, and the value of First Capital Advisor's preferred stock in First Capital REIT, which could be worth 5% of the gross value of all First Capital REIT's assets.  The magnitude of this unjust enrichment to Defendants Signal and Forum could exceed $50 million.

81.     On July 26, 2016, First Capital REIT, through Singal, held a public conference call for the purpose of announcing its intentions with respect to the sale of First Capital REIT's assets.  During that conference call, Singal stated:

> THE MODERATOR:  And another question as far as the transaction goes, will Presidential become the new advisor or will First Capital maintain its stance as the advisor to the REIT?
>
> SUNEET SINGAL:  We are actually still in determination of what the best plan for Presidential going forward will be.  Currently some of you guys may have heard that in June that we closed a partnership with Forum Partners of Europe our institutional sponsor partner in addition to First Capital, and so we've also brought on a senior management team that ran one of the most successful office REITs in the last decade.  And so we are looking at creating a new mix of sponsorship for that particular team and First Capital that would become the new kind of advisor for Presidential going forward.  And those specifics are being flushed out.  As we have that determined, we will then divulge that to the marketplace.

82.     In addition, First Capital REIT and Presidential REIT entered into an exclusivity agreement in connection with the sale, on the first to occur of, the execution of a definitive agreement with respect to the sale or September 18, 2016.

83.     The net effect of the sale will be to strip First Capital REIT and the First Capital Borrower and Guarantors of all of their assets, revenues, and income streams, leaving them incapable of paying the $16,259,556.67 obligation under the Note and the Guarantees. Without payments from First Capital REIT, the First Capital Borrower and Guarantors will have no source of revenue or income, and no ability to pay the debt owed to Plaintiffs.

84.     Upon information and belief, Defendants conspired and planned to effectuate the sale to Defendant Presidential REIT in order to interfere with and avoid the liabilities to Plaintiffs, as a means to avoid publishing audited financial statements, and to provide a cover to justify the increased $16.03 share valuation for First Capital REIT's common stock.

85.     On information and belief, Defendant Presidential REIT knowingly provided substantial assistance to First Capital REIT in consummating the sale by, among other things, agreeing to purchase the assets of First Capital REIT and its subsidiaries once they shed their obligations to Plaintiffs, to advance its own interests.

86.     Moreover, the Forum Defendants also played a large part in consummating the sale.  Indeed, Singal has admitted publicly that he and Forum and/or their respective affiliates intend to acquire the hyper-voting Presidential REIT Class A shares for themselves, and through the Class A Shares to exercise total control over Presidential REIT and its assets.

87.     In addition, in or about May 2016, Defendant Platt met with Plaintiff Frydman at his home in New York.  At that meeting, Platt stated in words or substance that he and the other Forum Defendants were making a $15 million loan to Defendant Singal and his affiliated entities for the purpose of acquiring control of First Capital REIT and the affiliated

First Capital Entities.‡ The vast majority of the ownership interests in First Capital Advisor, upon information and belief, have been pledged to the Forum Defendants as collateral security for the loan.

88.     Several days later, Platt visited Frydman at the offices of First Capital REIT and reiterated that he was in the process of acquiring control of First Capital REIT, or the real property assets under First Capital REIT's control, through a series of agreements with Defendant Singal and his affiliated entities.

89.     On or about August 16, 2016, Plaintiff Frydman met with Ryan A. Morfin, a New York investment banker, who had originally introduced Frydman to Defendant Platt. Morfin told Frydman at that meeting that the Forum Defendants were waiting to foreclose on their secured loan to the FC Defendants and to take control of First Capital REIT and/or its assets.

**The Sale Advances the FC Defendants' Interests at Plaintiffs' Expense**

90.     Upon information and belief, there are a number of purported reasons for the sale of First Capital REIT's assets to Presidential REIT.

91.     <u>First</u>, the FC Defendants can avoid disclosing First Capital REIT's financial position to its shareholders and creditors.  Upon information and belief, First Capital REIT has failed to file the requisite audited financial statements either because First Capital REIT cannot produce audited financials or wishes not to disclose audited financials.  As a result

---

‡ On information and belief, the Forum Defendants have structured their loan to Singal and his affiliates in a manner to be able to seize the collateral security and take over First Capital Advisor on its first default.  Upon information and belief, the Forum Defendants, even though ostensibly sitting in the position of a secured lender, are not acting in a lender capacity. Lenders generally have no voice in the day-to-day operations of their borrowers, do not participate in management decisions, or participate in and/or take senior management decisions. On information and belief, the Forum Defendants are plotting and scheming to take control of the First Capital Entities, free and clear of any liabilities to Plaintiffs and seek to control the day-to-day operations of the First Capital Entities.

of the sale, First Capital REIT will no longer be obligated to file statements of the First Capital Entities, since Presidential REIT will be the "acquirer." And Presidential REIT also publishes its audited financial statements (albeit showing a negative equity position of more than one million dollars). In this manner, the FC Defendants will avoid disclosing their financial position to their shareholders and creditors.

92.     Second, the FC Defendants can avoid disclosing the methodology for valuing First Capital REIT's shares at $16.03 per share. On July 18, 2016, First Capital REIT announced in a public disclosure under Rule 8K of the Securities and Exchange Act of 1934, that it had revalued its share price, and issued NAV per share of First Capital REIT at $16.03 per share, up approximately 28% (or representing approximately $100 million of total equity) since the September 15, 2015 transactions giving the FC Defendants control of First Capital REIT and its affiliates. First Capital REIT has not disclosed the methodology for said valuation. And if Defendants are permitted to close the sale, shareholders of both First Capital REIT and Presidential REIT will have no other independent method to justify the $16.03 valuation. The sale, therefore, can clearly be utilized to "justify" the $16.03 per share valuation.

93.     Indeed, if the sale is permitted to close, First Capital REIT will be able to claim that Plaintiffs were provided value, in that they were able to "swap" one share of First Capital REIT common stock valued at $16.03 for one share of Presidential REIT Class B stock. The foregoing, however, does not provide Plaintiffs with any value because, immediately prior to the sale, Presidential REIT's shares were publicly trading at between $00.01 and $00.03 per class B Presidential share.

94.     Third, the FC Defendants will be able to defraud Plaintiff JFURTI by stripping away the income of the First Capital Guarantors and First Capital Advisor -- the only

entities that currently have the capacity to earn enough money to repay Plaintiff JFURTI the sums it is owed.  These entities receive all or virtually all of their income from the laundry list of fees (identified in footnote 1), representing approximately $25 million per year, which are paid by First Capital REIT.  By "selling" all of First Capital REIT's assets to Presidential REIT, First Capital REIT will be left with no assets and, therefore, the First Capital Guarantors and First Capital Borrower will be stripped of all or virtually all of their income and will be unable to meet any of their financial obligations, including the debt owed to Plaintiff JFURTI, which by the end of this year, together with accrued interest and indemnification payments, will likely exceed $20 million.

95.   <u>Fourth</u>, the sale effectively gives the FC Defendants a new "wrapper" for the existing REIT assets, discarding only two entities which are problematic for the FC Defendants – First Capital REIT (which is under SEC investigation, and has not or cannot, for reasons unknown to Plaintiffs, file audited financial statements), and First Capital Advisor, which owes Plaintiffs large sums of money.

**<u>The Sale Advances Presidential REIT's Interests at Plaintiffs' Expense</u>**

96.   Upon information and belief, the sale also advances Presidential REIT's interests, at the expense of Plaintiffs and the current shareholders of First Capital REIT.

97.   <u>First</u>, because the sale would constitute a capital event of over $20 million, Presidential REIT and its principals stand to benefit considerably.  Upon information and belief, upon such a capital event, the Presidential REIT principals will (i) collect deferred compensation of several hundred thousand dollars, (ii) collect substantial deferred bonuses; (iii) exercise, upon information and belief, 1,700 warrants, to acquire 1,700,000 shares of Presidential REIT at $00.10 per share, when the manifested value of each such share is $16.03 after the combination,

and (iv) collect a "profit" of $27 million at the cost of the current First Capital REIT shareholders, including Plaintiffs, who will be diluted dollar-for-dollar up to the same $27 million as a result thereof.

98.     By way of background, Presidential REIT only has two paid employees, but Presidential REIT is unable to pay those employees their salaries because it is losing money annually and has no funds from which to pay the salaries.  Last year Presidential REIT cancelled approximately $425,000.00 in accrued and unpaid salary that it was unable to pay its employees, by issuing warrants giving one unpaid employee the right to purchase up to 1.7 million of Presidential REIT shares at $00.10 per share, which right could not be exercised until Presidential REIT had effected a capital transaction involving at least $20 million.  Thus, the sale gives the employees the right to buy for just $170,000 (1.7 million x $00.10) a total of $27,251,000 of publicly traded shares (1.7 million x $16.03 stated price).  If such shares are immediately sold, the employees would be significantly enriched, at a stiff dilution to the current First Capital shareholders of more than $27 million.

99.     Second, the sale gives Defendant Presidential REIT the right to acquire a portfolio of approximately $300 million of real estate assets for no consideration (other than printing some new stock certificates).  According to its own SEC filings, Presidential REIT is broke.  Notably, according to its March 16, 2016 quarterly financial reports, Presidential REIT had:

> (a)     an EBITDA loss of  -$602,480.00;
>
> (b)     a net income of -$506,490.00;
>
> (c)     a negative profit margin of -53.24%;
>
> (d)     a negative operating margin of - 68.60%;

34

(e)      a negative operating cash flow of -$798,840.00;

(f)      a negative levered free cash flow of -$69,280.00; and

(g)      $00.09 per share in cash in the bank.

100.    In fact, a review of Presidential REIT's current financial statements suggests that Presidential REIT does not even have sufficient cash on hand to undertake a reasonable due diligence investigation of the true value of the assets of First Capital REIT, which they are "agreeing to buy" at $16.03.   On information and belief, Presidential REIT has no interest in undertaking any due diligence investigation with respect to the assets of First Capital REIT which it is ostensibly "acquiring" because as long as the transaction involves over $20 million (which it will under any analysis), it provides an exit for the current Presidential REIT insiders.  Nonetheless, and despite its financial difficulties, Presidential REIT is acquiring First Capital REIT's portfolio of approximately $300 million of real estate assets.

101.    Third, the sale allows diversion of all the fees paid to the First Capital Entities to a new advisory entity, controlled by Presidential REIT.   On information and belief, Defendants Singal, Forum and Marble, and/or their respective affiliates, have already acquired or are negotiating for the acquisition of a majority of Presidential REIT Class A shares (which effectively controls the Presidential REIT as it has rights to elect 75% of the Presidential REIT board, while the Class B shares only have the right to elect 25% of the Presidential REIT board). This will allow them to control Presidential REIT, and to arrange for Presidential REIT to enter into a new advisory agreement with a new advisor and property manager in place of First Capital Advisor and FCREI.  In so doing, they will deprive the First Capital Guarantors of the revenue needed to pay their obligations to Plaintiffs, and make it impossible for Plaintiffs to collect from the First Capital Borrower and Guarantors.

102.    Moreover, as the CEO and Chairman of both First Capital Advisor and First Capital REIT, Singal is in a position to cause First Capital Advisor to voluntarily "waive" the substantial fees that First Capital REIT would otherwise be required to pay to First Capital Advisor should First Capital REIT terminate its agreement with First Capital Advisor.  That would further deprive First Capital Advisor of the revenues which Plaintiffs relied upon in restructuring, for a fourth time, the defaulted obligations of the FC Defendants and accepting First Capital Advisor as a guarantor.

### The FC Defendant's Wrongful Refusal to Convert OP Units at the Correct NAV

103.    By operation of the Settlement Agreement, JFURTI is entitled to convert units it holds in the Operating Partnership ("**OP Units**") into shares of the public REIT.

104.    Specifically, Section 8 of the Settlement Agreement states in pertinent part as follows:

> The REIT hereby agrees that JFURTI and FC Borrower (individually referred to herein as an "Electing Party," and collectively the "Electing Parties") shall each have the option, from time to time after September 15, 2016, to cause the conversion of all or any of the OP Units held as collateral under the Security Agreement, to common shares of the REIT on a one-for-one basis, subject to compliance with the "5/50" test, which forbids a REIT from having five or fewer individuals owning more than 50% of the value of the REIT's common stock, as well as the general requirements of the charter documents for the REIT (recognizing that the board of the REIT has waived the restriction that no single holder may hold more than 9.8% of the outstanding common shares of the REIT). Should either of the Electing Parties elect to exercise the right herein granted, such Electing Party shall, from time to time, provide the REIT with written notice of their election and identify the number of OP Units being converted to common stock of the REIT at that time, and the REIT shall direct its transfer agent to issue one share of common stock for each OP Unit converted, and deliver to the Electing Parties evidence of same together with share certificates (or other evidence) within thirty (30) days of the date of said exercise notice.

The provisions of this Section 8 shall survive the transactions contemplated herein, and shall not be merged in any document delivered in connection with the transactions contemplated herein.

105.    JFURTI exercised its right to convert the pledged collateral into common stock of First Capital REIT, with an effective date of September 16, 2016.

106.    The FC Defendants, through their wrongful dominion over First Capital REIT and its assets, have to date has failed to perform or recognize the conversion at the correct NAV to the extreme detriment of JFURTI.

107.    The sale of assets to Presidential REIT constitutes a "Roll-Up Transaction," as that term is defined by the Charter of First Capital REIT.

108.    The Charter of First Capital REIT, in connection with a Roll-Up Transaction, requires the following at Article XV thereof:

> In connection with any proposed Roll-Up Transaction, an appraisal of all of the Corporation's assets shall be obtained from a competent Independent Appraiser. . . .  In connection with a proposed Roll-Up Transaction, the Person sponsoring the Roll-Up Transaction shall offer to holders of Common Shares who vote against the proposed Roll-Up Transaction the choice of: (a) accepting the securities of a Roll-Up Entity offered in the proposed Roll-Up Transaction; or (b) one of the following: (i) remaining as Stockholders and preserving their interests therein on the same terms and conditions as existed previously; or (ii) receiving cash in an amount equal to the Stockholder's pro rata share of the appraised value of the Net Assets.
>
> The Corporation is prohibited from participating in any proposed Roll-Up Transaction: (a) that would result in the holders of Common Shares having voting rights in a Roll-Up Entity that are less than the rights provided for in Sections 12.1 and 12.2 hereof; (b) that includes provisions that would operate as a material impediment to, or frustration of, the accumulation of Shares by any purchaser of the securities of the Roll-Up Entity (except to the minimum extent necessary to preserve the tax status of the Roll-Up Entity), or which would limit the ability of an investor to exercise the voting rights of its securities of the Roll-Up Entity on the basis of the number of Shares held by that investor; (c) in which investor's rights to access of records of the Roll-Up Entity will be less than those described in

Sections 12.4 and 12.5 hereof; or (d) in which any of the costs of the Roll-Up Transaction would be borne by the Corporation if the Roll-Up Transaction is rejected by the holders of Common Shares.

109.    Given the foregoing, the conversion at the correct NAV, and the stockholder status of JFURTI conferred upon conversion of the OP Units, is of great financial benefit to JFURTI, which benefit is being intentionally, fraudulently, and wrongfully withheld from it by the FC Defendants.

## The FC Defendants' Additional Mismanagement of the First Capital Entities

110.    Since Defendant Singal and the other FC Defendants acquired control of First Capital REIT, they have continually and consistently mismanaged First Capital REIT, and the FC Defendants have taken a number of improper steps on behalf of First Capital REIT.

111.    First Capital REIT has failed to file any required quarterly financial statements or annual audited financial statements in violation of its reporting requirements under the federal securities laws.

112.    First Capital REIT has failed to file any required supplemental prospectuses, especially during the periods when First Capital REIT's stock was being sold to the public.

113.    First Capital REIT has recently represented to the public recently that the NAV per share of its stock has grown from $12.49 to $16.03 per share without providing adequate public disclosure to support this questionable increased valuation.

114.    First Capital REIT and the FC Defendants have defaulted on four mortgage loans or preferred equity financing in its portfolio, associated with four real properties owned by First Capital REIT at 299, 319 and 325 Main Street, Poughkeepsie, New York, and 945 82nd Avenue, Myrtle Beach, Horry County, South Carolina (Parcel ID No.: 165-08-02-026).

The financing had been  personally guaranteed by Plaintiff Frydman when those transactions were originally consummated prior to the sale to Defendant Singal and his various affiliated companies, and which guaranties were expressly assumed  as part of the September 15, 2015 sale transaction to Defendant Singal and his various affiliated companies;

115.    In connection with one of the above-referenced financings secured by 319 Main Street, after being notified of the FC Defendants' default, Plaintiff Frydman voluntarily suggested to the lender bank, and established (with the lender bank's consent) a separate bank account with the lender bank to be used solely to fund any mortgage, insurance or property tax payments which First Capital REIT and/or the FC Defendants failed to make (the "**Default Prevention Account**").  This allowed Plaintiff Frydman to avoid a regulatory write-off of the loan by the lender bank, and to honor his guaranty.  To this end, Plaintiff Frydman caused a sum of money representing three months of payment obligations to be deposited into the Default Prevention Account, which he agreed to replenish as it is drawn down, and in fact sums have been drawn upon by the lender bank for payment obligations which First Capital REIT and the FC Defendants have failed to make.

116.    The FC Defendants have also defaulted on payments required to be made pursuant to a preferred equity financing transaction with Arbor-Myrtle Beach PE LLC ("**Arbor**"), with respect to United 945 82nd Parkway Fee, LLC, the owner of an approximate 100,000 sq. ft. medical office building located in Myrtle Beach, South Carolina. The FC Defendants have failed to make required payments pursuant to said preferred equity financing arrangement, which was guaranteed by Plaintiff Frydman, and which guarantee was assumed by Defendant Singal and the other FC Defendants as part of the September 15, 2015 purchase transaction. In September 2016, Arbor contacted Plaintiff Frydman to advise that the financing

arrangement was in default for more than 120 days, and that plaintiff Frydman will be liable pursuant to his guarantee in the sum of $1,811,000.00 as a result of the FC Defendants' failure to make requisite payments.

117.    Not only has First Capital REIT defaulted on the payment of preferred equity financing obligations, insurance premiums, real estate taxes and principal and interest payments due under various mortgages, but First Capital REIT, through action that can only be described as recklessness for a public REIT, lost title to one of the mortgaged properties located at 299 Main Street for nonpayment of property taxes.  This left the unpaid mortgage debt, which Frydman personally guaranteed, still due and owing, but with the collateral gone and no asset for the lender (as a secured creditor) or Frydman (as a subrogor of the lender) to execute upon.

118.    First Capital REIT, along with other FC Defendants, failed to make contractual indemnification payments to JFURTI and Frydman in excess of $5.2 Million, pursuant to the Settlement Agreement, which indemnification payments were demanded by JFURTI and Frydman pursuant to two separate demands, one in the amount of approximately $1.3 million on or about June 16, 2016, and the other in the amount of approximately $3.9 million on or about September 29, 2016.  The FC Defendants' failure to pay obligations they have assumed and for which they have agreed to indemnify Plaintiffs has caused damage to Plaintiffs well in excess of $5.2 million.   Upon information and belief, the FC Defendants deliberately, intentionally and maliciously failed to pay these obligations in order to cause injury to Plaintiffs.

119.    The FC Defendants have caused the dissipation, waste and loss from First Capital REIT of the Houston Hotels.

**<u>Required Demand to Bring this Action</u>**

120.    First Capital REIT's board, which was hand-picked by Defendant Singal and the majority of which is interested in the transaction through which Presidential REIT will acquire the assets of First Capital REIT, cannot reasonably be expected to respond to a demand to initiate this action in good faith and within the ambit of the business judgment rule, and as such, any demand would be futile.

121.    By way of example, Singal is the CEO and Chairman of First Capital REIT, the CEO and Chairman of First Capital Advisor, which controls and runs First Capital REIT, and an obligor on the Note.

122.    The sale advances Singal's and the other FC Defendants' own self-interests because they are on all sides of the transaction, in their respective capacities as the CEO, President and Advisor of First Capital REIT and as co-owners of Presidential REIT and, on information and belief, the newly formed advisor and property manager entities.

123.    The FC Defendants also failed to exercise business judgment in approving the sale because it constitutes a fraudulent conveyance and results in stripping First Capital REIT of all of its assets, which, in turn, prevents the First Capital Borrower and Guarantors from being able to meet their payment obligations to Plaintiffs.

**FIRST CLAIM FOR RELIEF**
**(Violation of 18 U.S.C. § 1962(c) directly by Plaintiffs Against all**
**Defendants except First Capital REIT and First Capital OP)**

124.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

125.    Title 18 U.S.C. § 1962(c) makes it unlawful to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity.

126.    This First Claim is against the Defendants (Forum, Platt, Marble, Presidential, Singal, Vande Steeg, McCook, First Capital Advisor, FCREI, First Capital Borrower, and Tilden) other than First Capital REIT and First Capital OP.

127.    Each of the Plaintiffs is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

128.    Each of the Defendants is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c) and 1962(d).

## The RICO Enterprise

129.    The association of the Defendants constitutes an "enterprise" engaged in and whose activities affect interstate commerce.  All of the Defendants are employed by or associated with the Enterprise.

130.    Each of the Defendants agreed to and did conduct and participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs.

131.    Each of the Defendants is a person that exists separate and distinct from the Enterprise.

132.    Defendant Singal maintains command and control of the Enterprise on a strategic level, is the principal authority figure with final say on business decisions, and has taken actions and directed other members of the Enterprise to take actions that are necessary to accomplish the overall criminal aims of the Enterprise.  From and through his positions of responsibility as the owner and executive of the FC Private Entities, the Chief Executive Officer and Chairman of First Capital REIT, the control person of the First Capital Entities, the majority owner of First Capital Borrower and First Capital Guarantors, and an obligor on the Note, Singal

has conducted and participated in the operation and management of the Enterprise and its affairs, and has been a central participant in the orchestration, planning, and execution of the Enterprise's schemes to defraud Plaintiffs.

133.    Defendant Platt is in command and control of the Forum Defendants and has taken actions, and directed other members of the Enterprise to take actions, necessary to accomplish the overall criminal aims of the Enterprise.  In secret concert with Singal, Platt -- both individually and through Forum and Marble -- has acquired a significant interest in First Capital REIT and arranged to participate in the operational control of the FC Defendants and First Capital REIT, acting at all times for the benefit of the Forum Defendants and the Enterprise, and to the detriment of the owners and shareholders of the FC Defendants and First Capital REIT and First Capital OP who are not associated with the Enterprise.

134.    Defendants Vande Steeg and McCook currently serve as purported independent directors of First Capital REIT.  In that capacity, they directly participated in the determination of the net asset value of the stock of the REIT and the Enterprise's Fraudulent Scheme with respect to the sale or transfer of assets of the REIT, the Operating Partnership and the special purpose entities owned by the Operating Partnership, such as Tilden.  Despite the fiduciary obligation they owe to First Capital REIT and its shareholders, including Plaintiffs, Defendants Vande Steeg and McCook, in their association with the Enterprise, have affirmatively conducted and participated in the conduct of the affairs of the Enterprise.

### Wire and Mail Fraud (Violation of 18 U.S.C. § § 1341, 1343)

135.    Defendants conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5), in violation of 18 U.S.C. § 1962(c).

43

136.    Pursuant to and in furtherance of their fraudulent scheme, Defendants committed multiple related acts of mail fraud and/or wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343, respectively.

137.    Specifically, Defendants, having devised a scheme or artifice to defraud, and/or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmitted or caused to be transmitted by means of mail or wire communication in interstate or foreign commerce, writings, signs, signals, pictures or sounds for the purpose of executing such scheme or artifice (namely, to defraud Plaintiffs with respect to the purchase money obligation).  These included the following communications:

(a)     Through the mail and wires, Defendant Singal made false representations to Plaintiffs and First Capital REIT and First Capital OP regarding the value of the assets contributed by the FC Defendants as part of the sale transaction, including by letter dated September 15, 2015 (which Singal sent to Frydman by email) in which Singal knowingly and falsely represented that "Among the Contributed Assets, eight assets are being transferred by deed, and the balance of the assets are being transferred by assignments of membership interests, partnership interests and/or contract rights. The deeds are being provided with respect to the Amarillo, Texas hotel, the three California assets owned by Central Valley Gas Station Atwater Partnership, LLC, the two California assets owned by Central Valley Gas Station Development LLC, the Highway 99 Avenue number one property and the La Jolla property, both of which are owned by First Capital Real Estate Investments LLC," and agreed that the seven California deeds and the one Texas deed would be delivered into escrow, with each of the deeds to be filed of record in the appropriate recording offices for Plaintiffs' benefit not later than the close of business Monday, September 21, 2015.  The foregoing representation was false in that none of

44

the eight deeds to said properties were filed of record in the appropriate recording offices for the Plaintiff's benefit not later than the close of business Monday, September 21, 2015, and Singal had no intention of recording said deeds when he made the statement on September 15, 2015.

(b)     Through the mail and wires, Defendant Singal made false representations to Plaintiffs and First Capital REIT and First Capital OP regarding the value of the assets contributed by the FC Defendants as part of the sale transaction, including by letter dated September 15, 2015 in which Singal represented that "[a]mong the Contributed Assets, are five hotel properties in New Mexico (Roswell, Farmington, Gallup, Grants and Albuquerque) which are each owned by special purpose entities each of which special purpose entities are 91% owned by First Capital Real Estate Investments, LLC ("FCREI") and with respect to which, FCREI has the right to transfer 100% of the ownership of said special purpose entities, and contribute same in accordance with the Agreements."  Singal knew that the foregoing statement was false when he made it because Singal knew that the FC Defendants owned as little as 9% of certain of those assets, and that they in fact did not have the right to transfer 100% of the ownership of said special purpose entities, and contribute same in accordance with the Agreements.

(c)     Through the mail and wires, Defendant Singal made knowingly false representations to Plaintiffs and First Capital REIT and First Capital OP regarding the value of the assets contributed by the FC Defendants as part of the sale transaction, including by letter dated September 15, 2015 in which Singal represented that "third parties unaffiliated with FCREI had entered into a contract to acquire some or all of the interest relating to the five hotel properties, and after breaching that contract, fraudulently and without authority, executed quitclaim deeds purporting to transfer the ownership of those properties to a number of entities

unaffiliated with FCREI, and 25% to FCREI as tenancies in common," and advised that the referenced quitclaim deeds are invalid and unauthorized.  In reliance on said representations and in express reliance thereon, First Capital REIT and First Capital OP agreed to "taking an assignment of 100% of the membership interests in each of the SPE's which own the properties pursuant to the terms of the Agreements," when in fact, said representations were false.

        (d)      Through the mail and wires, including, without limitation, emails to Jacob Frydman dated August 26, 27, 29, 30, and 31, and September 1, 2, 3, 4, 5, 6, 8, 9, 10, 11 and 12 of 2015, the FC Defendants made false representations to Plaintiffs and First Capital REIT and First Capital OP with respect to: (i) the ownership of the assets being contributed pursuant to the Asset Contribution Agreement; (ii) the amount of debt then existing, and which was being assumed by First Capital OP; (iii) the liens then existing with respect to the assets being contributed pursuant to the Asset Contribution Agreement which was being assumed by First Capital OP; and (v) the value of said assets; which representations and warranties resulted in certain schedules attached to or made a part of two 8-K reports filed by the FC Defendants with the SEC on September 21 and September 25, 2015, and which were false in that the FC Defendants:

        (i)      falsely represented that FC Private Entities had title to, and were able to transfer the RREAF portfolio, when in fact they neither had title to said assets, nor were they able to transfer the RREAF portfolio to the Operating Partnership;

        (ii)      falsely represented that FC Private Entities owned 100% of hotels in Roswell, NM, Farmington, NM, Gallup, NM, Grants, NM, and Albuquerque, NM, when in fact they owned only between 10% and 91% of said assets;

(iii)    represented and warranted that FC Private Entities "owned" the contributed properties in Antigua, with a net value of more than $3,600,000.00, when in fact the properties in Antigua were not owned assets, but rather a contract right with significant payment obligations;

(iv)    represented and warranted that FC Private Entities had title to the ownership interests in the RREAF portfolio, when in fact it did not, resulting in the loss to the Operating Partnership of the hotels comprising the RREAF portfolio valued at more than $20 million;

(v)    represented and warranted that FC Private Entities equity value in the contributed assets was $65,508,402.00, when in fact, it was less than $56 million, resulting in an equity "shortfall" of more than $9.5 million, which sum (and any distributions made with respect to same) has never been returned to the Operating Partnership; and which resulted in an unjust enrichment of the FC Defendants of more than 764,000 OP Units, which, at $16.03 per Unit, represents an overpayment by the Operating Partnership of $ 12,249,164.20;

(vi)    failed to disclose more than $5,450,000.00 in then existing debt secured by the contributed assets, but which was not disclosed, resulting in the debt assumed with respect to the contributed assets, excluding the RREAF portfolio being over $54 million, when it was represented to be $48,831,933.00;

(vii)    failed to disclose tax liens then existing on the contributed assets increasing the amount of encumbrances, with more than $1 million in past due real estate taxes currently due and not disclosed;

(viii)    represented that FC Private Entities would provide title insurance in favor of the Operating Partnership at a cost of approximately $275,000.00, at its costs, when in fact, it has failed to do so; and

(ix)    represented that the franchise agreements relating to the hotels which were to be contributed were in good standing, and that the counterparties had consented to the transfers to the Operating Partnership, when, in fact, almost every one of the hotel franchise agreements were either terminated, in default, or subject to termination, and would subject the hotel properties to a loss of flag or franchise.

(e)    Through the mail and wires, Defendant Singal made false representations to Plaintiffs and First Capital REIT and First Capital OP and the shareholders of the First Capital REIT, including Plaintiffs Frydman and JFURTI, regarding the net asset value ("NAV") of the common stock of the First Capital REIT, by letter dated October 14, 2016 with its attached Exhibit A sent by FedEx and electronically by email, which contained an "Investment Confirmation" as of October 14, 2016 which valued 1,465,827.58207 shares of common stock of the FC REIT at $18,308,186.50, or an NAV of $12.49 per share, when at the same time the FC Defendants have filed statements with the U.S. Securities and Exchange Commission "certifying" under penalties of perjury, that the per share NAV of said shares is $16.03 per share, or a discrepancy of $5,189,029.64.   A review of the First Capital web site during October 2016 also proudly announces that the NAV per share of the First Capital common stock is $16.03 per share[§].   Therefore, either the FC Defendants have misrepresented

---

[§] The following is a screenshot of said web site:

the value of the 1,465,827.58207 shares of common stock of the FC REIT by claiming that said shares are worth $5,189,029.64 *LESS* than the publicly disclosed value, or they have misrepresented the NAV to be $16.03 per share, when in reality, the true NAV is only $12.49 as set forth on the referenced Investment Confirmation.

(f)     In telephone conversations during the Spring of 2016 and in emails to Frydman, Defendant Singal made false and misleading statements about the approximately $17 million that First Capital REIT raised through a public offering of common stock between September 20, 2015 and February 28, 2016, by stating that said funds were used for "appropriate REIT purposes."  On information and belief, said sums were in fact wrongfully used to bail-out other First Capital Private real estate projects, and divert the First Capital REIT funds to the Forum Defendants, all to the benefit of the FC Defendants and the Forum Defendants, and to the detriment of the First Capital REIT, the Operating Partnership, and Plaintiffs.

(g)     On September 16, 2016, the FC Defendants caused almost $3.5 million belonging to Tilden Fee, LLC, a wholly-owned subsidiary of the Operating Partnership which had no obligations to the Forum Defendants, to nonetheless be wrongfully transferred by wire transfer to the Forum Defendants without justification, unjustly enriching the Forum



Defendants at the expense of the Operating Partnership, the First Capital REIT and its shareholders.

(h)     On July 26, 2016, Defendant Singal conducted a telephonic press conference in which he made false and misleading statements about the proposed sale of assets to Presidential REIT and the resulting impact on the FC Defendants.

138.   Each participant knew, expected, reasonably foresaw and intended that these communications by mail and wire in interstate and foreign commerce would be used in furtherance of the racketeering scheme, and such use was an essential part of the scheme.

**Pattern of Racketeering Activity**

139.   The acts of racketeering activity referred to in the previous paragraph constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. 1961(5). Defendants engaged in the pattern of racketeering activity from at least September 2015 continuing through the present time to frustrate and hinder Plaintiffs' enforcements and collection of the purchase money obligation now evidenced by the Note and Guarantees.  That pattern included multiple predicate acts of mail and wire fraud.

140.   The aforesaid acts had the same or similar purposes, results, participants, victims, and/or methods of commission, and were otherwise interrelated by distinguishing characteristics and were not isolated events.

141.   The racketeering acts identified above (a) were in furtherance of a common goal, including the goal of frustrating and hindering Plaintiffs' enforcement and collection of the purchase money obligation; (b) used similar methods to perpetrate the fraud; (c) had similar participants; and (d) had the same victims.

142.   The acts of racketeering activity discussed above extended over a substantial period of time beginning in or around 2015 and continuing to and through the present time.   These acts were a regular way of conducting Defendants' ongoing business and of conducting or participating in the ongoing RICO Enterprise.   They were a critical means of supporting Defendants' business and continue to form a pattern of racketeering activity.

143.   Defendants participated in the scheme through themselves and, in particular, under the leadership of Singal and Platt.   Defendants benefited enormously from the fraudulent scheme.

144.   Each Defendant's participation was critical to the racketeering scheme. They enabled, conducted, maintained, aided, abetted, and profited from the racketeering scheme as detailed above.

145.   The precise role each Defendant played is known only to Defendants at this time.   Such information and evidence concerning their participation is exclusively within the possession and knowledge of the Defendants.

146.   Defendants' pattern of unlawful activity and corresponding violations of 18 U.S.C. § 1962(c) proximately and/or directly caused Plaintiffs to suffer injury to their business or property within the meaning of 18 U.S.C. § 1964(c); to wit, Plaintiffs suffered damages in an amount in excess of $25 million.   The damages suffered by Plaintiffs were reasonably foreseeable and intended by Defendants and/or anticipated as a substantial factor and a natural consequence of their pattern of unlawful activity.

147.   As a result of their misconduct, Defendants are liable to Plaintiffs for their losses.

148.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover threefold their damages plus costs and attorneys' fees from Defendants.

## SECOND CLAIM FOR RELIEF
### (Violation of 18 U.S.C. § 1962(d), directly by Plaintiffs Against all Defendants Except First Capital REIT and First Capital OP)

149.     Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

150.     In violation of 18 U.S.C. § 1962(d), Defendants and others whose identities are known only to Defendants at this time, conspired to violate the provision so 18 U.S.C. § 1962(c) in that, beginning in September 2015 and continuing through the present time, they knowingly agreed and conspired together and with others to conduct or participate, directly or indirectly, in the affairs of an enterprise through the pattern of racketeering activity described above.  The sophisticated frauds that were perpetrated and continuance of this scheme could not have occurred without the consent and knowing connivance of Defendants and other conspirators.

151.     As part of and in furtherance of their conspiracy, Singal, Platt and the other Defendants agreed to and conspired in the condition of the many predicate acts described above, with the knowledge that they were in furtherance of that knowledge of pattern of racketeering activity.  As part of and in furtherance of their conspiracy, each of these Defendants agreed to and did commit at least two predicate acts of racketeering.  Further, each Defendant's actions are attributable to the other Defendants.

152.     None of Defendants have withdrawn, or otherwise disassociated themselves, from the conspiracy at issue or the other conspirators.

153.    As a direct and proximate result of each Defendant's violations, Plaintiffs have been injured as aforesaid in their business or property by reason of Defendants' violations of 18 U.S.C. § 1962(d).

154.    By reason of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs are entitled to treble damages, pre- and post-interest, costs, and attorneys' fees.

### THIRD CLAIM FOR RELIEF
**(Violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78(j)(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5, directly by Plaintiffs Against the FC Defendants)**

155.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

156.    The FC Defendants, and in particular Singal, falsely represented to Plaintiffs the value of the pledged shares of stock of First Capital REIT, and repeatedly provided false and misleading information to Plaintiffs and the public about the financial condition, obligations and operations of First Capital REIT.  Defendants knew that these statements were false and misleading and were designed and did effect the purchase money obligation evidenced by the Note and Guarantees and secured by the pledge of stock, in violation of federal securities laws.

157.    The FC Defendants employed devices, schemes and artifices and omissions to defraud; made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and engaged in acts, practices and a course of business which operated as a fraud and deceit upon the Plaintiffs.

158.    Plaintiffs have suffered damages in that, in reasonable reliance on the integrity of the FC Defendants' representations, Plaintiffs entered into and then restructured the

purchase money obligation, most recently in the June 2016 Settlement Agreement, wherein had they been aware of the true facts they would not have done so.

159.    As a direct and proximate result of the FC Defendants' wrongful conduct, Plaintiffs suffered damages in connection with the purchase money obligation, including in particular the pledge of stock of First Capital REIT, in excess of $25 million.

**FOURTH CLAIM FOR RELIEF**
**(Violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78(j)(b) and**
**Rule 10b-5, 17 C.F.R. § 240.10b-5, Derivatively by Plaintiffs on**
**Behalf of First Capital REIT and First Capital OP against Defendant Singal)**

160.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

161.    Defendant Singal, in connection with the purchase of the First Capital Entities as of September 15, 2015, made untrue statements of material fact and omitted to state material facts that he had a duty to disclose.

162.    Singal had a duty to disclose to First Capital REIT and the Operating Partnership material information known to him because, inter alia, he made representations that gave rise to a duty to speak completely, accurately, and truthfully, and there was a fiduciary of similar trust of confidence between the parties.

163.    Singal misstated and omitted material facts with intent to defraud and with reckless disregard for the truth, and First Capital REIT and the Operating Partnership justifiably relied on Defendants' statements and omissions to their detriment.

164.    Singal falsely represented to First Capital REIT, the shareholders of the REIT, and the Operating Partnership and its limited partners, the value of the assets which he and the FC Private Entities (together "**Buyer**") were contributing to First Capital REIT and First

Capital OP in the Master Agreement and Asset Contribution Agreements of September 14, 2015, and the Settlement Agreement, by, among other misrepresentations[**]:

   (a) the FC Private Entities are the owners of the UPREIT Assets, or have the right to acquire 100% of the ownership interests in each of the UPREIT Assets, and will convey to First Capital REIT at Closing good and marketable title to the UPREIT Assets owned by the FC Private Entities free from all claims, liens and encumbrance except only the Permitted Exceptions;

   (b) there are no proceedings at law or in equity before any court, grand jury, administrative agency or other investigative agency, bureau or instrumentality of any kind pending or, to the best of Buyer's knowledge, threatened, against or affecting the UPREIT Assets;

   (c) that FC Private Entities' performance under the Master Agreement and the Asset Contribution Agreement are within their powers and have been duly authorized by all requisite actions, and Buyer obtained, or at Closing shall have obtained, all approvals required to be obtained by Buyer to consummate all of the transactions contemplated in those agreements; and are the legal, valid and binding obligation of the FC Private Entities enforceable in accordance with their terms;

   (d) that no consent, authorization, license, permit, registration or approval; or exemption or other action by, any third parties or governmental or public bodies, commissions or authorities are required in connection with the execution, delivery and

---

[**] Each of which were made at Section 5.10 of the Master Agreement, and then incorporated by reference in the Asset Contribution Agreement.

performance by FC Private Entities of the Master Agreement and the Asset Contribution Agreement;

(e)     that except for the Master Agreement and the Asset Contribution Agreement, FC Private Entities had not entered into any agreement nor otherwise granted to any person, and no person or entity has any right or option to (i) acquire any or all of the UP REIT Assets, or (ii) right of first offer or right of first refusal to purchase all or any portion of the UPREIT Assets;

(f)     except as specifically disclosed, all sums payable by reason of any labor or materials heretofore furnished with respect to the UPREIT Assets or the land or improvements comprising or relating to the UPREIT Assets have been, paid, and Buyer knows of no dispute in connection therewith;

(g)     that none of the UPREIT Assets or the land or improvements comprising or relating to the UPREIT Assets is in the hands of a receiver nor is an application for the appointment of a receiver pending;. nor was there any petition in bankruptcy pending at the time of said transfer;

(h)     that all information and documents delivered by First Capital to the seller parties relating to the UPREIT Assets are, to the actual, current knowledge of Buyer, true, complete and accurate in all material respects, and with respect to documents, are true, correct and complete copies thereof;

(i)     that Schedule 1 attached to the Master Agreement truthfully and accurately disclosed in all material respects, all debt owed with respect to each of the UPREIT Assets or the land or improvements comprising or relating to the UPREIT Assets, all sums needed to complete any construction or improvements with respect to the UPREIT Assets or the

land or improvements comprising or relating to the UPREIT Assets, and all minority interests owned by persons other than the Buyer with respect to each of the UPREIT Assets or the land or improvements comprising or relating to the UPREIT Assets;

(j)      that the debt obligations secured by, or which are the obligation of the persons that hold title to the UPREIT Assets are current and not in default, that Buyer has not received any notice of default with respect to any of said debt; and Buyer has the right either contractually or based on its existing relationships, to cause holders of the minority interests in the UPREIT Assets which are not owned by FC Private to contribute their interests to the Operating Partnership (or a Taxable REIT Subsidiary) in connection with the UPREIT Transaction and are disclosed on Schedule 1, simultaneously with or prior to the Closing in exchange for a OP Units, and FC Private shall cause all such minority interest to be contributed to the Operating Partnership as part of the UPRElT Transaction; and

165.      Defendants employed devices, schemes, and artifices and omissions to defraud; made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and engaged in acts, practices and a course of business which operated as a fraud and deceit upon the Plaintiffs.  Among other misrepresentations made by the FC Defendants to Plaintiffs, each of the representations and warranties made by the FC Defendants in the following sections of the Asset Contribution Agreement have been found to be false and fraudulent:

(a)      Section 3.1 - that each Contributor has all requisite power and authority to execute, deliver and perform its obligations under this Agreement and any other Transaction Documents. Each Contributor (other than the Contributors that are natural persons) has taken all necessary action to authorize the execution, delivery and performance of this

57

Agreement and any other Transaction Documents. Upon the execution and delivery of any Transaction Document to be executed and delivered by any Contributor, such Transaction Document shall constitute the valid and binding obligation of such Contributor enforceable against such Contributor in accordance with its terms; and that the person or persons executing and delivering this Agreement or any other Transaction Document on behalf of any Contributor is and shall have been prior to the Closing Date, duly authorized to execute and deliver such documents on behalf of such Contributor; and no Contributor that is an entity is in default under or in violation of any provision of its Organizational Documents.

(b)      Section 3.2 - that each Contributor owns its respective Contributed Assets free and clear of all Liens, except for the Permitted Exceptions.  Except for the Asset Contribution Agreement and the other Transaction Documents and the transactions contemplated thereby there are no agreements, arrangements, options, warrants, calls, rights (including preemptive rights) or commitments of any character to which any Contributor is a patty relating to the sale, purchase or redemption of any of such Contributor's respective Contributed Assets. Upon delivery to the Operating Partnership on the Closing Date of each Contributor's respective Contributed Assets as contemplated by the Asset Contribution Agreement, such Contributor will thereby transfer to the Operating Partnership good and marketable title to such Contributed Assets, free and clear of all Liens, except for the Permitted Exceptions. Except with respect to the JV Entities and the Ground Lessor Property, by acquiring the Contributed Assets, the Operating Partnership will acquire, directly or indirectly, or, with respect to the Under Contract Properties, will receive the right to acquire, a 100% fee simple interest in each of the Properties as well as the underlying Real Properties, Improvements and Other Property Rights.

(c)      Section 3.3 - that (i) all the issued and outstanding Contributed Interests have been duly authorized and are validly issued, fully paid and non-assessable. (ii) each Contributed Entity does not beneficially own, directly or indirectly, any subsidiaries or outstanding equity interests of any other Person; (iii) that no Contributed Entity has any liabilities other than (x) Permitted Liens, (y) in connection with future performance obligations under any Operating Agreements disclosed to the Operating Partnership, (z) those liabilities accrued or reflected on the most recent balance sheet provided to the Operating Partnership by the Contributors or incurred in the ordinary course of business since the date of such balance sheet, or (iv) those liabilities that will be satisfied at the Closing pursuant to the Asset Contribution Agreement.

(d)      Section 3.4 - that (i) All Affiliated Purchase Contracts have been duly and validly authorized by the parties to such Affiliated Purchase Contracts; (ii) All Affiliated Purchase Contracts are in full force and effect; (iii) No monetary or material non-monetary default (beyond applicable notice and cure periods) by any patty exists under any Affiliated Purchase Contract; (iv) There exists no event, occurrence, condition or act (including the transactions contemplated by the Asset Contribution Agreement) that, with the giving of notice or the lapse of time or the happening of any further event or condition, would reasonably be expected to give rise to a default or breach by Contributors or, to the knowledge of the Singal, any other party under any Affiliated Purchase Contract; (v) that no counterparty under any Affiliated Purchase Contract is presently the subject of any voluntary or involuntary bankruptcy or insolvency proceedings.

(e)      Section - 3.5 - that with respect to each Contributor, neither the execution and delivery of the Asset Contribution Agreement or any other Transaction Document

by such Contributor, nor the consummation of any of the transactions contemplated hereby or thereby, nor compliance with or fulfillment of the terms, conditions and provisions hereof or thereof will: (a) conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation or a loss of rights under, or result in the creation or imposition of any Lien upon such Contributor's Contributed Assets, under (i) any Organizational Documents of such Contributor if such Contributor is an entity, (ii) any agreement, document or instrument (including Operating Contracts) to which any Contributor is a party or by which such Contributor or any of its Contributed Assets is bound, (iii) any term or provision of any judgment, order, writ, injunction, or decree binding on any Contributor (or its assets or properties, including Contributed Assets or Properties), or (iv) any Laws applicable to such Contributor; or (b) require the approval, consent, authorization or act of, or the making by such Contributor of any declaration, filing or registration with, any Person.

(f)    Section 3.8 - that each Contributor has been solvent at all times prior to and will remain solvent for no less than 180 days following, the transfer of the Contributed Assets to the Operating Partnership.

(g)    Section 3.9 - that except as otherwise disclosed in writing by Contributor, no Proceeding or Order is pending against or affecting any Contributor or any of its Affiliates (and, to the knowledge of such Contributor, no such Proceeding or Order has been threatened in writing): (a) under any bankruptcy or insolvency Law; (b) that seeks or could be reasonably likely to seek injunctive or other relief in connection with this Agreement, any of the other Transaction Documents or the transactions contemplated hereby or thereby; or (c) that

reasonably could be expected to adversely affect (i) the performance by such Contributor under the Asset Contribution Agreement or any other Transaction Document.

(h)     Section 3.10 - that except as shall have been satisfied on or prior to the Closing Date through the Required Consents and Approvals having been obtained or otherwise, no consent, waiver, approval or authorization of, or filing with, any Person or Governmental Authority or under any applicable Laws is required to be obtained by any Contributor in connection with the execution, delivery and performance of the Asset Contribution Agreement and the transactions contemplated therein, except for those consents, waivers, approvals, authorizations or filings, the failure of which to obtain or to file would not have a Material Adverse Effect.

(i)     Section 3.11 - that except as would not have a Material Adverse Effect, (a) all Tax Returns and reports required to be filed with respect to the Contributed Assets or by any Contributed Entity (including the JV Contributed Entities) have been timely filed (after giving effect to any filing extension properly granted by a Governmental Authority having authority to do so) and all such Tax Returns and reports are accurate and complete in all material respects, and all Taxes required to be paid with respect to the Contributed Assets or by any Contributed Entity (including the JV Contributed Entities) have been timely paid in full whether or not shown to be due and payable on such Tax Returns, (b) no deficiencies for any Taxes have been proposed, or assessed with respect to the Contributed Assets or any Contributed Entity, and (c) the Contributed Entities (including the JV Contributed Entities) have complied with all applicable Laws and agreements relating to the payment and withholding of Taxes and have, within the time and in the manner prescribed by applicable Laws and agreements, withheld and paid over to the proper Governmental Authority all amounts required to have been withhold and

61

paid in connection with amounts paid or owing to any past or present employee, independent contractor, creditor, member, consultant or other third party. No waivers of the statutes of limitation are in effect in respect of any Taxes and none of the Contributed Entities (including the JV Contributed Entities) has agreed to any extension of time with respect to a Tax assessment or deficiency. There are no Liens for Taxes (other than Permitted Liens) upon any of the Contributed Assets. Each Contributed Entity (including the JV Contributed Entities) and any other entity in which a Contributed Entity (including the JV Contributed Entities) owns an equity interest has been at all times since its formation treated as other than an association taxable as a corporation for U.S. federal income tax purposes.

(j)      Section 3.13 - that except as set forth on Schedule 3.13, the Properties have been maintained, and the Contributors have not received written notice that any such Property is not, in compliance in all material respects with all applicable laws, ordinances, rules, regulations, codes, orders and statutes (including, without limitation, those currently relating to fire safety, conservation, parking, Americans with Disabilities Act, zoning and building laws) whether federal, state or local, except where the failure to so comply would not have a Material Adverse Effect.

(k)      Section 3.17 - that except as set forth on Schedule 3.17, ( a) all leases (including the ground lease related to the Ground Leased Property), licenses, subleases, tenancies, possession agreements, occupancy agreements with tenants, subtenants or licensees, Franchise Agreements, property management agreements, television and internet service contracts, loans or other financing agreements related to the Properties (including without limitation agreements related to the Assumed Debt and all Other Property Rights) and all other contracts material to the operations of the Properties (the "**Operating Contracts**") are in full

force and effect, (b) no monetary or material non-monetary default (beyond applicable notice and cure periods) by any party exists under any such Operating Contract, (c) there exists no event, occurrence, condition or act (including the transactions contemplated by this Agreement) that, with the giving of notice or the lapse of time or the happening of any further event or condition, would reasonably be expected to give rise to a default or breach by Contributors or, to the knowledge of the Contributors' Representative, any other patty under any Operating Contract, and ( d) no counterparty under any of such Operating Contract is presently the subject of any voluntary or involuntary bankruptcy or insolvency proceedings, except in each case as would not reasonably be expected to have a Material Adverse Effect.

(l)     Section 3.18 - that Schedule 3.18 sets forth (a) a true, complete and correct list of the Hotels and Gas Station that are subject to a Franchise Agreement, (b) the name and date of each Franchise Agreement and (c) any outstanding or incomplete capital expenditures or improvements planned or approved for any Hotel and required pursuant to the Franchise Agreement for such Hotel. True, complete and correct copies of each Franchise Agreement and any outstanding so-called property improvement plans required to be completed for any Hotel have been delivered or made available to the Operating Partnership.

(m)     Section 3.24 - that with respect to each Contributed Asset, the Contributors will provide, at or prior to Closing or promptly thereafter, audited financial statements, books, records and other financial information sufficient for URTI to timely prepare the audited financial statements and pro forma financial information required to be filed with the SEC by URTI pursuant to Regulation S-X under the Securities Act in connection with the transactions contemplated by this Agreement (the "**S-X Financial Information**").

166.    Each of the foregoing representations and warranties made by the FC Defendants have proven to be false and fraudulent:

(a)    each Contributor did not have the requisite power and authority to execute, deliver and perform its obligations under the Transaction Documents and each Contributor did not own its respective Contributed Assets free and clear of all Liens, except for the Permitted Exceptions.

(b)    There were agreements other than the Transaction Documents granting options, warrants, calls, rights, preemptive rights or other rights or commitments relating to the sale, purchase or redemption of any of such Contributor's respective Contributed Assets which were not disclosed.

(c)    Not all the issued and outstanding Contributed Interests had been duly authorized and validly issued, fully paid and non-assessable and some of the Contributed Assets were owned in whole or in part by entities owned by persons not parties to any of the Transaction Documents.

(d)    There existed liabilities other than the Permitted Liens, those liabilities were not reflected on the most recent balance sheet provided to the Operating Partnership by the Contributors and those liabilities were not satisfied at the Closing.

(e)    Not all Affiliated Purchase Contracts have been duly and validly authorized by the parties to such Affiliated Purchase Contracts, and not all of the Affiliated Purchase Contracts are in full force and effect.

(f)    There were monetary or material non-monetary defaults (beyond applicable notice and cure periods) under Affiliated Purchase Contract.

(g)     There existed numerous events, occurrences, conditions or acts (including the transactions contemplated by the Asset Contribution Agreement) that, with the giving of notice or the lapse of time or the happening of any further event or condition, did give rise to a default or breach by Contributors which were reasonably knowable.

(h)     There were counterparties under any Affiliated Purchase Contracts that were then the subject of any voluntary or involuntary bankruptcy or insolvency proceedings, and consummation of the transactions contemplated did conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation or a loss of rights under, or result in the creation or imposition of any Lien upon such Contributor's Contributed Assets.

(i)     Certain of the Contributors were not solvent at all times prior to and did not remain solvent for no less than 180 days following, the transfer of the Contributed Assets to the Operating Partnership.

(j)     There existed undisclosed Proceeding pending against or affecting any Contributor; the Required Consents and Approvals were not obtained.

(k)     All Tax Returns and reports were not properly or timely filed, were not accurate and complete in all material respects, and all Taxes required to be paid with respect to the Contributed Assets or by any Contributed Entity (including the JV Contributed Entities) were not timely paid in full.

(l)     The FC Defendants did receive written notice that any certain contributed assets were not in compliance in all material respects with all agreements, applicable laws, and all leases licenses, subleases, tenancies, possession agreements, occupancy agreements with tenants, subtenants or licensees, Franchise Agreements, property management agreements,

television and internet service contracts, loans or other financing agreements related to the Properties and all other Operating Contracts were not in full force and effect.

(m)    There existed monetary or   material non-monetary defaults (beyond applicable notice and cure periods) under any such Operating Contract, and there existed events, occurrences, conditions and/or acts that, with the giving of notice or the lapse of time or the happening of any further event or condition, would reasonably be expected to give rise to a default or breach by Contributors.

(n)    There were outstanding or incomplete capital expenditures or improvements planned or approved for certain Hotel properties required pursuant to the Franchise Agreement for such Hotels.

(o)    The FC Defendants did not provide, at or prior to Closing or promptly thereafter, audited financial statements, books, records and other financial information sufficient for URTI to timely prepare the audited financial statements and pro forma financial information required to be filed with the SEC by URTI pursuant to Regulation S-X under the Securities Act.

167.    As a direct and proximate result of Defendants' wrongful conduct, First Capital REIT and the Operating Partnership have suffered damages in connection with the purchase money obligation, including in particular the pledge of stock of First Capital REIT, in excess of $25 million.

**FIFTH CLAIM FOR RELIEF**
**(Breach of Fiduciary Duty Owed to First Capital**
**REIT, First Capital OP and Plaintiffs by the FC Defendants)**

168.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

66

169.     The FC Defendants collectively operate and control First Capital REIT and First Capital OP.

170.     The FC Defendants each owe First Capital REIT and First Capital OP and Plaintiffs fiduciary obligations, including the obligation of good faith, fair dealing, loyalty and due care.  Moreover, each of the FC Defendants owes First Capital REIT and First Capital OP and Plaintiffs the fiduciary duty to exercise good faith and diligence in the administration of the affairs of First Capital REIT and First Capital OP and in the use and preservation of their property and assets.

171.     By way of example, Section 5 of the Advisory Agreement provides:

**FIDUCIARY RELATIONSHIP.** The Advisor, as a result of its relationship with the [First Capital REIT] and the Operating Partnership pursuant to this Agreement, stands in a contractual and fiduciary relationship with the Stockholders and the partners in the Operating Partnership.

172.     By engaging in the misconduct and mismanagement detailed above, the FC Defendants breached their fiduciary duties to First Capital REIT and First Capital OP and Plaintiffs.

173.     By undertaking and approving the dissipation of assets, and the sale to Presidential REIT, the FC Defendants disregarded sound business practices and knowingly, intentionally, recklessly, and/or negligently breached their respective fiduciary duties owed to First Capital REIT and First Capital OP and Plaintiffs.

174.     The sale constitutes a fraudulent conveyance.

175.     The sale and the wrongful dissipation and misuse of assets causes First Capital REIT and First Capital OP to waste their assets and expend corporate funds improperly, impairs their reputation and credibility for no legitimate business purpose, and results in

67

stripping First Capital REIT, First Capital OP and in turn the First Capital Borrower and Guarantors of their assets, revenues, and income streams, leaving them incapable of meeting their obligations to Plaintiffs.

176.    Since closing on the September 15, 2015 transaction, the FC Defendants have defaulted on four consecutive occasions on the purchase money loan from Plaintiff JFURTI.  In addition, the FC Defendants have: (a) failed to file financial statements for First Capital REIT; (b) failed to file supplemental prospectuses; (c) represented to the public the NAV per share of First Capital REIT without disclosing any details or methodology or releasing any underlying appraisals; (d) caused First Capital REIT to default on three mortgages in First Capital REIT's portfolio that were personally guaranteed by Plaintiff Frydman, and which obligations, including without limitation, the Frydman guaranty, were assumed by Singal and First Capital REIT as part of the original sale transaction in September 2015, and with respect to which Plaintiff Frydman has been contractually indemnified; (e) lost title to one property for nonpayment of property taxes, leaving the debt and Plaintiff Frydman's personal guaranty still due and owing; (f) caused dissipation and loss of the Houston Hotels; (g) caused dissipation and loss of cash obtained through stock sales; (h) borrowed a $15 million loan from the Forum Defendants in exchange for a secret commitment to transfer the assets of First Capital REIT, free and clear of liability to Plaintiffs, to a new entity controlled by Singal and the Forum Defendants; and (i) caused private loans to be repaid with cash assets belonging to the public REIT.

177.    The sale and the dissipation of assets wrongfully advances the FC Defendants' own interests, and those of their partners in this scheme, the Forum Defendants.

178.    Singal (in his own right, and as the control person for the First Capital Entities) is on all sides of the transaction, in his capacity as the CEO and Chairman of First

Capital REIT and First Capital Advisor, the co-obligor to JFURTI on the approximately $16.2 million promissory note, which is in default.

179.    As a direct and proximate result of the FC Defendants' failure to perform properly their respective fiduciary obligations, First Capital REIT, First Capital OP and Plaintiffs have sustained significant damages.

180.    As a result of the misconduct alleged herein, the FC Defendants are liable to First Capital REIT, First Capital OP and Plaintiffs for its damages.

### SIXTH CLAIM FOR RELIEF
**(Aiding and Abetting of Breach of Fiduciary Duty -
Against the Forum Defendants and Presidential REIT)**

181.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

182.    As alleged above, the FC Defendants owe fiduciary duties to First Capital REIT, First Capital OP and Plaintiffs, which the FC Defendants breached.

183.    The Forum Defendants and Presidential REIT substantially assisted and aided and abetted the FC Defendants in breaching their fiduciary duties.

184.    On information and belief, the Forum Defendants made a loan of approximately $15,000,000.00 to the FC Defendants in late May or early June 2016, and took the controlling interests in the FC Entities as collateral security for that loan.

185.    On information and belief, it has always been, and continues to be, the undisclosed plan of the Forum Defendants to use its loan to take control of the First Capital Entities, and by virtue thereof, First Capital REIT.  The loan has been structured in a way, which makes it highly likely that the First Capital Entities will default and give rise to the Forum Defendants' right to foreclose on that collateral.

186.    Since closing their loan with the FC Defendants in late May or early June 2016, on information and belief, the Forum Defendants, acting beyond the scope of any reasonable lender, have imbedded their employees into senior management roles within the First Capital group of companies, all with the tacit permission and approval of the FC Defendants, and by virtue thereof, the FC Defendants have yielded their corporate authority to the Forum Defendants and wrongfully permitted the Forum Defendants to exercise (directly or indirectly) control over First Capital Advisor and by virtue thereof, First Capital REIT.

187.    On information and belief, the Forum Defendants, who have "locked-up" all of Singal's and FCREI's equity interests in the various First Capital Entities, in the form of collateral security for loans advanced to Singal, FCREI and other First Capital Entities, have the ability, either by contract, or by force of their secured creditor position to exercise undue influence on Singal and the other FC Defendants, because, on information and belief, the Forum Defendants are intent on foreclosing on their collateral, and taking over as the owners of the First Capital Entities, and by virtue thereof, becoming the control persons of both the First Capital Entities and Presidential REIT.

188.    Defendant Platt, the control person behind the Forum Defendants, is a US citizen, who has run the operations of Forum from offices in London, England.  Although Defendant Platt owns a residence in Connecticut, he and his wife have been living most of the time in London.  Upon information and belief, since the Brexit event, UK lawmakers have been discussing a new tax system to tax foreigners living in the UK at a disproportionately higher tax rate.  As a result, since the Brexit event, upon information and belief, Defendant Platt has been seeking a US platform to take control of, so that he may return to the US, and avoid the post-Brexit tax regime being considered for the UK.

70

189.    First Capital REIT is precisely the type of platform, which the Forum Defendants would find attractive.  In fact, as a "test run" of this theory, the Forum Defendants have expended considerable time and resources to use the First Capital infrastructure to launch at least one new security offering product, which the Forum Defendants wish to sponsor in the US and sell to US persons using the First Capital platform.

190.    Upon information and belief, the first such offering has proven to be a success, giving the Forum Defendants "proof" that their game plan, to usurp the First Capital platform away from the FC Defendants, could be the platform they need to return their operations from the UK to the US, at a time when the Forum Defendants principals fear increased taxation and diminished acceptance of foreign nationals living and working in the UK.

191.    As a result thereof, the Forum Defendants have enhanced and strengthened their control over the FC Defendants by inserting senior Forum personnel into management roles within First Capital, and taking actions, which most lenders would fear taking, as they may put themselves in a position of losing their status as a lender.  And by virtue thereof have instructed the FC Defendants to breach their fiduciary duties as above described.

192.    Upon information and belief, the actions taken by the Forum Defendants are as follows: the strategic plan to find a shell public US REIT to take over in a way where the Forum Defendants, alone or together with the FC Defendants, will control that public US REIT, and use it as their platform in the US as they wind-down their UK operations and transfer their operations to the US, resulted in the announcement referenced above regarding the acquisition by Presidential REIT of all or substantially all of the assets of First Capital REIT.

193.    The Forum Defendants abused their position of lender to the FC Defendants,  based on their superior position and the severe financial ramifications of a default

by the FC Defendants on their loan obligation to the Forum Defendants, and because, upon information and belief, it is now, and has always been, the plan of the Forum Defendants to use their loan (and an anticipated default thereof) to obtain control over the FC Defendants, and eventually foreclose upon their collateral, thereby also giving them title to the ownership interests in the FC Defendants, and by virtue thereof, take over First Capital REIT, and after the sale, also control Presidential REIT, all for the benefit of the Forum Defendants, and to the detriment of the Plaintiffs.

194.     The Forum Defendants are effectively controlling the actions of the FC Defendants, and upon information and belief, instructing the FC Defendants to take the actions complained of above, fully knowing that such actions constitute breaches of the FC Defendants' fiduciary duties to First Capital REIT and Plaintiffs.

195.     Upon information and belief, both the Forum Defendants and Presidential REIT knew about FC Defendants' obligations to the First Capital Entities, which in turn, are liable to the Plaintiffs under the Note and Guarantees.

196.     Presidential REIT and the Forum Defendants knowingly participated in consummating the sale, with full knowledge that the sale would result in a fraudulent conveyance.   Presidential REIT and the Forum Defendants knowingly participated in the dissipation of cash assets of First Capital REIT as well.

197.     As a direct and proximate result of Forum Defendants and Presidential REIT aiding and abetting breaches of fiduciary duty, First Capital REIT, First Capital OP and Plaintiffs suffered damages, as alleged herein.

198.    As a result of the misconduct alleged herein, the Forum Defendants and Presidential REIT are liable to First Capital REIT, First Capital OP and Plaintiffs for their damages.

### SEVENTH CLAIM FOR RELIEF
**(Tortious Interference by Forum Defendants and
Presidential REIT with the Settlement Agreement)**

199.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

200.    The Settlement Agreement and the written agreements between First Capital REIT, First Capital Advisor and FCREI are valid and enforceable.

201.    Defendants Presidential REIT, Forum and Marble were aware of the Settlement Agreement and the written agreements between First Capital REIT, First Capital Advisor and FCREI, and understood that pursuant to these Agreements, the First Capital Guarantors, who depend on income or payments from First Capital REIT for their existence, were liable to Plaintiffs for the $16,259,556.67 purchase money loan evidenced by the Note and the Guarantees.

202.    Defendants Forum, Marble and Presidential REIT, intentionally and unjustifiably interfered with First Capital REIT and the FC Defendants' obligations under the Settlement Agreement and the written agreements between First Capital REIT, First Capital Advisor and FCREI by, among other things, (a) knowingly providing assistance to First Capital REIT in undertaking the sale by agreeing to purchase First Capital REIT's assets, which results in all assets being diverted away from First Capital REIT and the First Capital Borrower and Guarantors; and (b) upon information and belief, acquiring, or negotiating to acquire ownership of Class A shares in Presidential REIT, either alone, or together with Singal and some of the

73

other FC Defendants, in order to, *inter alia*, cause Presidential REIT to enter into new advisory and property management agreements with new entities, for the purpose of depriving First Capital Advisor and FCREI of revenue to be able to pay the obligations to Plaintiffs, and for the purpose of making impossible for Plaintiffs to collect from First Capital Advisor, FCREI or First Capital Borrower and Guarantors.

203.    As a direct and proximate result of the Forum Defendants' and Presidential REIT's wrongful and tortious interference with the Settlement Agreement and the written agreement between First Capital REIT, First Capital Advisor and FRCEI, Plaintiffs have sustained and will sustain significant damages.

204.    As a result of the misconduct alleged herein, the Forum Defendants and Presidential REIT are liable to Plaintiffs for their damages.

## EIGHTH CLAIM FOR RELIEF
### (Breach of the Settlement Agreement and Declaratory Judgment)

205.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

206.    By notice served on or about August 16, 2016, JFURTI exercised its option under Section 8 of the Settlement Agreement, with effective date of September 16, 2016, to convert its OP Units into Common Stock of First Capital REIT.

207.    At the time of the conversion, First Capital REIT's common stock had a published NAV of $16.03.

208.    Pursuant to the Settlement Agreement, the FC Defendants had an obligation to convert every OP unit into common stock on a one-for-one basis.   The FC

Defendants breached this obligation by attributing to the shares of stock issued to JFURTI on NAV of less than $12 a share.

209.    By reason of the foregoing, JFURTI has been charged an amount in excess of $5 million, and further seeks a declaratory judgment that effective September 16, 2016, it converted 1,465,827.58 OP Units into an equal number of shares of common stock of the First Capital REIT at the correct NAV.

## NINTH CLAIM FOR RELIEF
### (Declaratory Judgment - The Charter)

210.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

211.    As stated, the FC Defendants have caused First Capital REIT to take the position that JFURTI did not effectively exercise its option under the Settlement Agreement until October 16, 2016.

212.    The FC Defendants have taken this position in attempts to bar JFURTI from exercising its rights under the Charter of First Capital REIT to vote against the roll-up transaction, and obtain a cash payout.

213.    If JFURTI were given the right to exercise this option, and given the dissipation of First Capital REIT's assets, First Capital REIT would not be able to make the payout and therefore the roll-up could not occur.

214.    By reason of the foregoing, an actual and justiciable controversy exists regarding the treatment of the sale of assets to Presidential REIT.  JFURTI seeks a declaratory judgment that the sale constitutes a Roll-Up Transaction under the Charter of First Capital REIT,

and that JFURTI as stockholder as of September 16, 2016 is entitled to receive cash in an amount equal to its pro rata share of the appraised value of the Net Assets.

## TENTH CLAIM FOR RELIEF
### (Breach of Contract against the FC Defendants - The Master Agreement)

215.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

216.    Pursuant to Section 7.10(b) of the Master Agreement, as incorporated into Section 8 of the Settlement Agreement, the FC Defendants expressly agree that they shall "not take any action, or fail to take any action which does, or is in any way intended to, limit, diminish, hinder, impact negatively, circumvent, or otherwise directly or indirectly curtail, or attempt to curtail, and will not permit the Companies or any of their employees from acting or failing to act in any fashion which, may or does, or is intended to, limit, diminish, hinder, impact negatively, circumvent or otherwise directly or indirectly curtail or attempt to curtail, any of the rights reserved by and for the benefit of [Plaintiffs] and Plaintiff's Affiliates."

217.    By virtue of the FC Defendants' support of the sale of all or substantially all of the assets of First Capital REIT, the FC Defendants have also breached the Settlement Agreement and the Master Agreement, as the actions complained of are intended to, and indeed will, limit, diminish, hinder, impact negatively, circumvent, or otherwise directly or indirectly curtail, or attempt to curtail, the rights to which Plaintiffs are beneficiaries, and will permit the FC Defendants to, limit, diminish, hinder, impact negatively, circumvent or otherwise directly or indirectly curtail or attempt to curtail, the rights reserved by and for the benefit of Plaintiffs and Plaintiff's affiliates.

218.     The announced sale itself constitutes a breach of Section 8 of the Settlement Agreement, as it constitutes an action by the FC Defendants which does, or is in intended to, limit, diminish, hinder, impact negatively, circumvent, or otherwise directly or indirectly curtail, or attempt to curtail, the rights reserved by and for the benefit of Plaintiffs JFURTI and Frydman under the Master Agreement.

219.     As a direct and proximate result of the FC Defendants' breach of the Settlement Agreement and the Master Agreement, Plaintiffs have been, and will continue to be damaged, in an amount to be proved at the trial on the merits, believed to be not less than $25 million.

### ELEVENTH CLAIM FOR RELIEF
### (Fraudulent Conveyance - N.Y. Debtor & Creditor Law
### §§ 273, 274, 275 Against the FC Defendants and Forum)

220.     Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

221.     The payment of approximately $3.5 Million from Tilden to Forum on or about September 16, 2016 was made without any consideration whatsoever.

222.     As a result of the conveyance, First Capital REIT has been rendered insolvent, left with unreasonably small capital, and/or has been left in a position to incur debts beyond its ability to pay as they mature.  The conveyance has prevented the First Capital Entities from being able to meet their obligations to Plaintiffs.

223.     By reason of the foregoing, Plaintiffs are entitled to set aside the $3.5 Million conveyance and are entitled to attorneys' fees pursuant to NYDCL Sections 276 and 276-a.

### TWELFTH CLAIM FOR RELIEF
### (Fraudulent Conveyance - N.Y. Debtor & Creditor
### Law § 276 Against the FC Defendants and Forum)

224.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

225.    The payment of approximately $3.5 Million from Tilden to Forum on or about September 16, 2016 was made without consideration.

226.    The payment was undertaken with actual intent to hinder, delay or defraud Plaintiffs because, among other things: (1) The FC Defendants have a pattern of defaulting on their obligations to Plaintiffs; (2) First Capital REIT, upon information and belief had no obligations to Forum in its own name or in the names of the Operating Partnership or any special purpose entities; (3) the conveyance is not in the usual course of business for First Capital REIT; (4) the conveyance advances Singal's own interests because he is on both sides of the transactions, in his capacity as the CEO and President of First Capital REIT and as the Co-Owner of Presidential REIT; (5) Singal will retain control of the conveyed cash as co-owner of Forum's affiliate, Presidential REIT; (6) the conveyance was made without fair consideration; and (7) the conveyance has stopped the First Capital Entities from being able to meet their obligations to Plaintiffs under the Note and/or Guarantees.

227.    By reason of the foregoing, Plaintiffs are entitled to set aside the $3.5 Million conveyance and are entitled to attorneys' fees pursuant to NYDCL Sections 276 and 276-a.

## THIRTEENTH CLAIM FOR RELIEF
### (Fraudulent Conveyance - N.Y. Debtor & Creditor Law §§ 273, 274, 275 Against the FC Defendants and Presidential REIT)

228.   Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

229.   The Sale is to be made without fair consideration.

230.   As a result of the Sale, First Capital REIT will be rendered insolvent, will be left with unreasonably small capital, and/or will incur debts beyond its ability to pay as they mature.  The Sale will also prevent the First Capital Entities from being able to meet their obligations to Plaintiffs.

231.   By reason of the foregoing, Plaintiffs are entitled to set aside the prospective Sale and are entitled to attorneys' fees pursuant to NYDCL Sections 276 and 276-a.

## FOURTEENTH CLAIM FOR RELIEF
### (Fraudulent Conveyance - N.Y. Debtor & Creditor Law § 276 Against the FC Defendants and Presidential REIT)

232.   Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

233.   The Sale is to be made without fair consideration.

234.   The Sale was undertaken with actual intent to hinder, delay or defraud Plaintiffs because, among other things: (1) The FC Defendants have a pattern of defaulting on their obligations to Plaintiffs; (2) the Sale was not discussed and/or disclosed to JFURTI when the parties entered into the Settlement Agreement, only weeks before the Sale was announced; (3) the Sale is not in the usual course of business for First Capital REIT; (4) the Sale advances Singal's own interests because he is on both sides of the transaction, in his capacity as the CEO and President of First Capital REIT and as the Co-Owner of Presidential REIT; (4) Singal will

79

retain control of the conveyed property as co-owner of Presidential REIT; (5) the Sale was made without fair consideration because Presidential REIT is a shell entity with little or no assets, whose stock is traded in the over-the-counter market for $.01 per share, and its Class B common stock, which is being provided in exchange for substantially all of First Capital REIT's assets (and those of its subsidiaries) are, upon information and belief, worthless; and (6) the Sale will strip the First Capital Entities from being able to meet their obligations to Plaintiffs under the Note and/or Guarantees.

235.    By reason of the foregoing, Plaintiffs are entitled to set aside the prospective Sale and are entitled to attorneys' fees pursuant to NYDCL Sections 276 and 276-a.

## FIFTEENTH CLAIM FOR RELIEF
### (To Enjoin the Sale of Assets)

236.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

237.    Through the sale detailed above, Defendants have transferred or are in the process of transferring valuable assets from First Capital REIT and its subsidiaries to Presidential REIT in such a manner as to strip the assets, revenues and income stream from First Capital REIT, and the First Capital Borrower and Guarantors, without receiving fair consideration in return, and in express violation of the Settlement Agreement and the Master Agreement.

238.    Pursuant to Section 8 of the Settlement Agreement, which incorporates by reference the damages provisions of Section 10.1 of the Master Agreement, states as follows:

> It is recognized that damages in the event of breach by a party of any representation, warranty, covenant or agreement ... will be difficult if not impossible to ascertain. It is, therefore agreed that in addition to the indemnification rights … each non-breaching Party shall also have the right with respect to [material] breaches … to:

(a) <u>Injunction</u>.  An injunction against a breaching party issued by a court or arbitrator or arbitration panel of competent jurisdiction enjoining such breach, and each breaching party hereby consents to the issuance of any TRO, preliminary or permanent injunction enjoining the breaching conduct without limitation and without bond;

(b) <u>Specific Enforcement</u>.  The right to have such covenants specifically enforced by any court having equity jurisdiction, it being acknowledged and agreed that any breach of any of such covenants will cause irreparable injury to the non-breaching party to whom such covenant was made and that money damages will not provide an adequate remedy. Each party acknowledges and agrees that the covenants are reasonable and valid in all respects.

(c) <u>Other Remedies</u>.  Nothing contained in subsections 10.l(a), 10.l(b), 10.l(c) and/or 10.1(d) shall be construed as exclusive or as prohibiting a party from pursuing indemnification claims under Article IX or any other remedies available for such breach at law or in equity as may be permitted under this Agreement.

239.    Pursuant to both the Settlement Agreement and the Master Agreement, the FC Defendants have agreed that Plaintiffs are entitled to "[a]n injunction against a breaching party issued by a court or arbitrator or arbitration panel of competent jurisdiction enjoining such breach, and each breaching party hereby consents to the issuance of any TRO, preliminary or permanent injunction enjoining the breaching conduct without limitation and without bond."

240.    As alleged above, Plaintiffs are likely to succeed on the merits for all of the causes of action alleged herein.

241.    Plaintiffs will be irreparably harmed by the sale because it constitutes a fraudulent conveyance, will result in First Capital REIT, First Capital Borrower and Guarantors to be left without any assets, and will result in rendering ineffective any award that JFURTI may obtain in the actions pending in New York as a result of the breach of the Note and the Guarantees.

242.    First Capital REIT, First Capital OP and the First Capital Borrower and Guarantors will be irreparably harmed by the sale because they will be rendered insolvent, will be left with unreasonably small capital, and/or will incur debts beyond their respective ability to pay as they mature.

243.    The balance of the equities weighs in Plaintiffs favor.

244.    Plaintiffs are entitled, *inter alia*, to enjoin the FC Defendants from disposing of the assets of First Capital REIT and/or set aside any conveyance or annul any obligation to make such a conveyance of assets.

## SIXTEENTH CLAIM FOR RELIEF
### (To Enjoin the Sale of Assets -
### N.Y. Debtor & Creditor Law § 279 and applicable state law)

245.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

246.    Through the sale detailed above, the FC Defendants will transfer valuable assets from First Capital REIT and its subsidiaries to Presidential REIT in such a manner as to strip the assets, revenues and income stream from First Capital REIT, First Capital OP and the First Capital Borrower and Guarantors, without receiving fair consideration in return.

247.    The sale is made with the actual or constructive intent to hinder, delay or defraud the creditors of First Capital REIT, First Capital OP and the First Capital Borrower and Guarantors, including Plaintiffs.

248.    Plaintiffs will be irreparably harmed by the sale because it constitutes a fraudulent conveyance, will result in First Capital REIT, First Capital OP and the First Capital Borrower and Guarantors being left without any assets, and will result in rendering ineffective

any award that JFURTI may obtain in the actions pending in New York as a result of the breach of the Note and the Guarantees.

249.    First Capital REIT, First Capital OP and the First Capital Borrower and Guarantors will be irreparably harmed by the sale because they will be rendered insolvent will be left with unreasonably small capital, and/or will incur debts beyond their respective ability to pay as they mature.

250.    Under applicable New York law, including but not limited to Section 279 of the Debtor and Creditor Law, Plaintiffs are entitled, *inter alia*, to enjoin the FC Defendants from disposing of the assets of First Capital REIT and First Capital OP and/or set aside any conveyance or annul any obligation to make such a conveyance of assets.

251.    Plaintiffs have no adequate remedy at law.

252.    Accordingly, Plaintiffs seek relief in the form of a preliminary and permanent injunction.

### SEVENTEENTH CLAIM FOR RELIEF
**(On behalf of First Capital REIT and First Capital OP**
**Conversion Against the FC Defendants)**

253.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

254.    Through their mismanagement of First Capital REIT and First Capital OP, the FC Defendants have taken for their own benefit, and/or misused, cash assets belonging to First Capital REIT and First Capital OP; and in addition, have given over certain of those cash assets to the Forum Defendants.

255.     The action of FC Defendants is wrongful, and constitutes an unauthorized exercise of dominion over the property to the exclusion of its rightful owner First Capital REIT and First Capital OP, causing harm to First Capital REIT and First Capital OP.

256.     As a direct and proximate result of the FC Defendant's conversion and theft, First Capital REIT and First Capital OP have been, and will continue to be, damaged, in an amount to be proved at the trial on the merits.

**EIGHTEENTH CLAIM FOR RELIEF**
**(On behalf of First Capital REIT and First Capital OP, Aiding and**
**Abetting Conversion - Against the Forum Defendants)**

257.     Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

258.     Through their mismanagement of First Capital REIT and First Capital OP, the FC Defendants have taken for their own benefit, and/or misused, cash assets belonging to First Capital REIT and First Capital OP; and in addition, have given over certain of those cash assets to the Forum Defendants.

259.     The Forum Defendants had direct and substantial knowledge of this wrongful conduct.

260.     The Forum Defendants, upon information and belief, directed this wrongful conduct.

261.     The Forum Defendants have taken and/or accepted as their own from the FC Defendants certain of the cash assets belonging to First Capital REIT and First Capital OP.

262.     The action of Forum Defendants is wrongful, and constitutes an unauthorized exercise of dominion over the property to the exclusion of its rightful owner First Capital REIT and First Capital OP, causing harm to FIRST Capital REIT and First Capital OP.

263.     As a direct and proximate result of Forum Defendant's aiding and abetting of the conversion and theft, First Capital REIT and First Capital OP have been, and will continue to be, damaged, in an amount to be proved at the trial on the merits.

### NINETEENTH CLAIM FOR RELIEF
### (On behalf of First Capital REIT and First Capital OP,
### Waste & Mismanagement - Against the FC Defendants)

264.     Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

265.     The FC Defendants' unlawful conduct, including but not limited to their misappropriation, conversion and theft of assets belonging to First Capital REIT and First Capital OP, and its participation in a fraudulent conveyance, all of which is unconscionable, irrational and so far opposed to the interests of First Capital REIT and First Capital OP, constitutes waste and mismanagement of First Capital REIT's and First Capital OP's assets. And First Capital REIT and First Capital OP have been damaged.

266.     By reason of the foregoing, First Capital REIT and First Capital OP have been, and will continue to be, damaged and is entitled to a judgment against the FC Defendants in an amount to be determined at trial.

### TWENTIETH CLAIM FOR RELIEF
### (On behalf of First Capital REIT, Aiding and Abetting Waste &
### Mismanagement - Against the Forum Defendants)

267.     Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

268.     The FC Defendants' unlawful conduct, including but not limited to their misappropriation, conversion and theft of assets belonging to First Capital REIT, and its participation in a fraudulent conveyance, all of which is unconscionable, irrational and so far

85

opposed to the interests of First Capital REIT,  constitutes waste and mismanagement of First Capital REIT's assets.

269.    The  Forum  Defendants  were  aware  of,  participated  in,  and  upon information and belief directed for their own benefit, the wrongful conduct of the FC Defendants that constitutes waste and mismanagement.  And First Capital REIT has been damaged.

270.    By reason of the foregoing, First Capital REIT has been, and will continue to be, damaged and are entitled to a judgment against the Forum Defendants in an amount to be determined at trial.

## TWENTY-FIRST CLAIM FOR RELIEF
### (Accounting - Against the FC Defendants)

271.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

272.    First Capital REIT has a confidential and/or fiduciary relationship with its shareholders.

273.    The FC Defendants have caused First Capital REIT to breach the duty imposed by the relationship respecting property in which the shareholders have an interest.

274.    Defendants  should  provide  an  accounting  to  Plaintiffs  in  order  to determine (a) whether First Capital REIT had the ability to pay the mortgages on which it defaulted; (b) the amount, location, and use of all investments obtained during the September 15, 2015 - February 28, 2016 offering; (b) the origin of funds wired from 2520 Tilden Fee LLC to Forum and the justification for the wiring of funds; and (c) any and all additional transactions between any of the FC Defendants or their affiliates on the one hand and any of the Forum Defendants or their affiliates, on the other hand.

WHEREFORE, it is respectfully requested that this Court enter an Order:

a) On the First Claim for Relief, awarding treble damages and attorneys' fees under RICO in favor of Plaintiffs against Defendants in an amount to be determined at trial;

b) On the Second Claim for Relief, awarding treble damages and attorneys' fees under RICO in favor of Plaintiffs against Defendants in an amount to be determined at trial;

c) On the Third Claim for Relief, awarding damages under Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 in favor of Plaintiffs against the FC Defendants in an amount to be determined at trial;

d) On the Fourth Claim for Relief, awarding damages under Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 in favor of First Capital REIT and First OP and against the FC Defendants in an amount to be determined at trial;

e) On the Fifth Claim for Relief awarding damages not less than $25 million in favor of First Capital REIT, First Capital OP and Plaintiffs against the FC Defendants in an amount to be determined at trial;

f) On the Sixth Claim for Relief, awarding damages not less than $25 million in favor of First Capital REIT, First Capital OP and Plaintiffs against the FC Defendants in an amount to be determined at trial;

g) On the Seventh Claim for Relief, awarding damages not less than $25 million in favor of Plaintiffs against the FC Defendants in an amount to be determined at trial;

h) On the Eighth Claim for Relief, awarding damages to JFURTI in an amount in excess of $5 million, and finding and declaring the proper net asset value of the shares of stock of First Capital REIT that are pledged to Plaintiff JFURTI as collateral for the Note;

87

i)   On the Ninth Claim for Relief, finding and declaring that the sale constitutes a Roll-Up Transaction under the Charter of First Capital REIT, and that JFURTI, as a stockholder as of September 16, 2016, is entitled to receive cash in an amount equal to its pro rata share of the appraised value of the Net Assets;

j)   On the Tenth Claim for Relief, awarding damages not less than $25 million in favor of Plaintiffs against the FC Defendants in an amount to be determined at trial;

k)   On the Eleventh Claim for Relief, setting aside $3.5 million conveyance and awarding attorneys' fees pursuant to NYDCL Sections 273, 274 and 275;

l)    On the Twelfth Claim for Relief, setting aside $3.5 million conveyance and awarding attorneys' fees pursuant to NYDCL Sections 276 and 276-a;

m)   On the Thirteenth Claim for Relief, enjoining Defendants from disposing of the assets of First Capital REIT and First Capital OP and/or setting aside any conveyance or annual any obligation to make such conveyance of assets pursuant to applicable New York law, including but not limited to Section 279 of the Debtor and Creditor Law;

n)   On the Fourteenth Claim for Relief, enjoining Defendants from disposing of the assets of First Capital REIT and First Capital OP and/or setting aside any conveyance or annual any obligation to make such conveyance of assets pursuant to applicable New York law, including but not limited to Section 279 of the Debtor and Creditor Law;

o)   On the Fifteenth Claim for Relief, enjoining the FC Defendants from disposing of the assets of First Capital REIT and First Capital OP and/or setting aside any conveyance or annul any obligation to make such conveyance of assets pursuant to the Settlement Agreement;

88

p)  On the Sixteenth Claim for Relief, enjoining the FC Defendants from disposing of the assets of First Capital REIT and/or setting aside any conveyance or annul any obligation to make such conveyance of assets pursuant to the Settlement Agreement;

q)  On the Seventeenth Claim for Relief; awarding damages not less than $25 million in favor of Plaintiffs against the FC Defendants in an amount to be determined at trial;

r)  On the Eighteenth Claim for Relief, awarding damages not less than $25 million in favor of Plaintiffs against the FC Defendants in an amount to be determined at trial;

s)  On the Nineteenth Claim for Relief, awarding damages not less than $25 million in favor of First Capital REIT against the FC Defendants in an amount to be determined at trial;

t)  On the Twentieth Claim for Relief, awarding damages not less than $25 million in favor of First Capital REIT against the FC Defendants in an amount to be determined at trial;

u)  On the Twenty-First Claim for Relief, ordering Defendants to provide an accounting to Plaintiffs; and

v)  Awarding Plaintiffs pre-judgment and post-judgment interest, punitive damages, attorney's fees, the costs and disbursements of this action, together with such other and further relief as the Court deems just and proper.

Dated:  November 7, 2016

HERRICK, FEINSTEIN LLP


By:    s/ Christopher J. Sullivan
              Christopher J. Sullivan, Esq.
              2 Park Avenue
              New York, New York 10016
              (212) 592-1400
              csullivan@herrick.com

              *Attorneys for Plaintiffs*